SANDY WILLIAMS *vs.* EPISCOPAL DIOCESE OF MASSACHUSETTS
& another.[1]

Suffolk. February 4, 2002. - April 25, 2002.

Present: MARSHALL, C.J., GREANEY, IRELAND, SPINA, COWIN, SOSMAN, & CORDY, JJ.

*Church. Religion. Employment,* Discrimination. *Anti-Discrimination Law,*
Employment, Termination of employment. *Constitutional Law,* Establish-
ment of religion, Freedom of religion. *Jurisdiction,* Ecclesiastical
controversy.

The First Amendment to the United States Constitution precluded a Superior
Court judge's exercise of jurisdiction over an employment discrimination
complaint brought by a priest against the Episcopal Diocese of Mas-
sachusetts and its presiding bishop, where resolution of the dispute would
involve assessment of the diocese's priorities of its ministries and require
the defendants to defend the church's policies regarding its ministers.
[579-582]
This court declined to address the issue, not presented on the facts of an ap-
peal, whether the First Amendment provided a complete barrier to a
minister's complaints of conduct by church superiors that properly could
be characterized as sexual harassment in the context of an employment
discrimination claim. [582-583]

CIVIL ACTION commenced in the Superior Court Department on
July 21, 2000.

A motion to dismiss was heard by *Margaret R. Hinkle,* J.

The Supreme Judicial Court granted an application for direct
appellate review.

*David P. Angueira* for the plaintiff.

*L. Martin Nussbaum,* of Colorado (*William F. Looney, Jr., &
Kimberly Y. Jones* with him) for the defendants.

GREANEY, J. The plaintiff, an Episcopal priest, filed an employ-
ment discrimination action in the Superior Court, alleging that
the defendants, the Episcopal Diocese of Massachusetts
(Diocese) and the Right Reverend M. Thomas Shaw (the presid-

---

[1] The presiding Bishop of the Episcopal Diocese of Massachusetts.

ing bishop of the Diocese [Bishop]), discriminated against her based on her gender, in violation of G. L. c. 151B, § 4 (1) and (4), resulting in her constructive discharge when she was forced to resign from her position as an ordained minister and vicar of Saint Andrew's Episcopal Church of the Deaf in Brookline (St. Andrew's). The plaintiff's complaint alleges that (1) throughout her employment, she was paid considerably less than her similarly situated male colleagues; (2) when she complained about the disparate treatment, she was admonished and threatened with termination; and (3) she was constructively discharged as a result of being forced to work in a hostile work environment. The defendants moved to dismiss under Mass. R. Civ. P. 12 (b) (6), 365 Mass. 754 (1974), or, alternatively, for summary judgment under Mass. R. Civ. P. 56, 365 Mass. 824 (1974). A Superior Court judge considered the defendants' motion as one pursuant to Mass. R. Civ. P. 12 (b) (1), 365 Mass. 754 (1974), and allowed the motion on the ground that the First Amendment to the United States Constitution precludes civil courts from adjudicating disputes between a priest and her diocese. We granted the defendants' application for direct appellate review, and we now affirm the judgment of dismissal.

We begin by summarizing the factual background of this dispute, incorporating relevant facts alleged by the plaintiff in her complaint and supporting affidavit, as well as undisputed facts presented in documents submitted by the parties that were considered by the judge. In 1989, the plaintiff was hired by the Diocese to be director of liturgical life at Saint Andrew's, and to act as liaison between the deaf community and the Diocese. Part of the plaintiff's job was to advocate for the members of her congregation and defend their rights under civil and canon law. During the eight years of her employment, the plaintiff claims, she was treated disparately as compared to her male counterparts, including, but not limited to, her rate of pay and benefits. When the plaintiff complained of the disparate treatment, she was either ignored, had her salary and benefits frozen or reduced, or was told that she had no civil or ecclesiastical right to question the treatment she received.

Specifically, the plaintiff's affidavit states that, when she interviewed for the position at Saint Andrew's, she was given

an information packet that contained a salary and benefit range that was above the level of compensation she eventually received for her work. Her complaints to the Diocesan treasurer regarding the insufficient travel allowance provided her, according to the plaintiff, marked "the start of a pattern of behavior directed at [her] that was not directed at [her] male counterparts."

The plaintiff's affidavit states that the presiding bishop of the Diocese at that time (the predecessor to the Bishop who is a defendant in this action) consistently discredited her work and excluded her from important meetings. He once attempted to fire the plaintiff. Shortly after a new presiding bishop (the defendant Shaw) was elected, the plaintiff discussed with him the discriminatory actions taken against her and informed him that she was considering legal action against the Diocese. The Bishop then expressed his desire to work things out with the plaintiff. Although she received regular salary raises for the next two years, the plaintiff states in her affidavit that she "do[es] not believe [she] was ever raised to the Diocesan minimum standard, nor to the level of [her] male counterparts." The plaintiff continued to feel ignored by the Diocese. When the plaintiff expressed interest in relocating her ministry from Saint Andrew's, due to the possibility of a gift of land on the North Shore that was adjacent to two institutions for the deaf, the plaintiff felt that the Bishop failed sufficiently to consider the matter. The plaintiff's affidavit states that "if [she] had not been a woman, [the Bishop] would have taken this issue seriously, which he didn't."

On April 21, 1997, on learning that the Bishop intended to conduct an evaluation of her ministry by outside consultants, the plaintiff tendered the Bishop her letter of resignation, effective July 31, 1997. The plaintiff's letter offered the following reasons for her resignation: (1) "the failure of the Episcopacy and the Episcopal staff to recognize and respect the primary role that the members of St. Andrew's must have in deciding, not only their own destiny, but also the direction of [d]eaf [m]inistry in the Diocese"; (2) the Bishop's "failure to respect and trust [the plaintiff's] insights and judgments . . . . [The Bishop's] need to bring in [a m]issioner to the [d]eaf from

another [d]iocese to evaluate the program here indicates to me that you do not trust the [m]issioner you have"; (3) the lack of "advocacy and support, both tangible and emotional, from the Episcopacy" and the "cloud of distrust and animosity that ha[s] plagued this Diocese since before either [the Bishop or the plaintiff] were ordained"; and (4) the "inequity of salary and benefits" that she was receiving.

The judge allowed the defendants' motion to dismiss the plaintiff's claims on the ground that the First Amendment deprived the Superior Court of subject matter jurisdiction.[2] The judge recognized that the doctrine known as the "ministerial exception," adopted by Federal courts in the context of Federal employment discrimination suits, precludes civil courts from adjudicating employment discrimination suits by ministers against their church or religious institution. See *McClure* v. *Salvation Army*, 460 F.2d 553, 559-561 (5th Cir.), cert. denied, 409 U.S. 896 (1972) (reviewing cases in which United States Supreme Court had placed matters of church government and

---

[2]Although the issue is not raised by either party, we note that the judge properly converted the defendant's motion under Mass. R. Civ. P. 12 (b) (6), 365 Mass. 754 (1974), as one pursuant to Mass. R. Civ. P. 12 (b) (1), 365 Mass. 754 (1974). The judge, however, could have decided the motion on the ground of the complaint's failure to state a claim on which relief can be granted. See *Mathias* v. *Beatrice Foods Co.*, 23 Mass. App. Ct. 915, 916 n.4 (1986). See also *Madsen* v. *Erwin*, 395 Mass. 715, 717 (1985) (jurisdiction preclusion based on First Amendment protection raised in context of motion to dismiss under rule 12 [b] [6]); *Natal* v. *Christian & Missionary Alliance*, 878 F.2d 1575, 1576 (1st Cir. 1989) (same issue raised in context of motion to dismiss under Fed. R. Civ. P. 12 [b] [6]). The important point is that consideration of matters outside of the pleadings generally compels a judge to treat a motion to dismiss under rule 12 (b) (6) as a motion for summary judgment. See *Watros* v. *Greater Lynn Mental Health & Retardation Ass'n, Inc.*, 421 Mass. 106, 109 (1995). Such is not the case when deciding a motion to dismiss under rule 12 (b) (1). See *id.* Cf. *Bell* v. *Zoning Bd. of Appeals of Gloucester*, 429 Mass. 551, 555 (1999) (authorized in certain circumstances). This difference is not merely technical — under a rule 12 (b) (1) motion, a plaintiff bears the burden of proving jurisdictional facts, see *New Hampshire Ins. Guar. Ass'n* v. *Markem Corp.*, 424 Mass. 344, 346 (1997); *Brown* v. *Tobyne*, 10 Mass. App. Ct. 833 (1980); J.W. Smith & H.B. Zobel, Rules Practice § 12.8 (1974 & Supp. 2002), while under a motion filed pursuant to Mass. R. Civ. P. 56, 365 Mass. 824 (1974), the defendant, as the moving party, has the initial burden of showing that there is no genuine issue as to any material fact and, thus, he or she is entitled to judgment as a matter of law. See *Kourouvacilis* v. *General Motors Corp.*, 410 Mass. 706, 716 (1991).

administration beyond regulation of civil authorities; holding that application of Title VII of the Civil Rights Act of 1964 to employment relationships between ministers and churches involves prohibited intrusion into matters of ecclesiastical concern). See also *Combs* v. *Central Tex. Annual Conference of the United Methodist Church,* 173 F.3d 343, 348-349 (5th Cir. 1999); *Schmoll* v. *Chapman Univ.,* 70 Cal. App. 4th 1434, 1436, 1438-1440 (1999); *Van Osdol* v. *Vogt,* 908 P.2d 1122, 1129, 1132-1133, 1134 (Colo. 1996); *Newport Church of the Nazarene* v. *Hensley,* 161 Or. App. 12, 22-23 (1999).

The "ministerial exception" doctrine is based on the premise that a minister's relationship to an organized church is intrinsically religious. Because civil resolution of disputes surrounding a minister's employment unavoidably would involve investigation and review of the church's practices and decisions with respect to, among other matters, the minister's assignment, salary, and duties, allowing jurisdiction of employment discrimination claims would result in governmental intrusion into an area of religious freedom forbidden by the principles of the First Amendment. See *McClure* v. *Salvation Army, supra* at 560 (articulating, for first time, the "ministerial exception" to Title VII claims). In the words of the United States Court of Appeals for the Fifth Circuit in the *McClure* decision, as quoted by the judge: "The relationship between an organized church and its ministers is its lifeblood. The minister is the chief instrument by which the church seeks to fulfill its purpose. Matters touching this relationship must necessarily be recognized as of prime ecclesiastical concern. Just as the initial function of selecting a minister is a matter of church administration and government, so are the functions which accompany such a selection. It is unavoidably true that these include the determination of a minister's salary, his place of assignment, and the duty he is to perform in the furtherance of the religious mission of the church." *Id.* at 558-559.

The judge reasoned that, given the "ministerial exception" doctrine's widespread acceptance in Federal and State appellate courts, including its application by the United States Court of Appeals for the First Circuit, see *Natal* v. *Christian & Missionary Alliance,* 878 F.2d 1575 (1st Cir. 1989), and *Dowd* v. *Society*

*of St. Columbans*, 861 F.2d 761 (1st Cir. 1988), the doctrine should be applied to this case. The judge subsequently concluded that the exception "squarely addressed" the plaintiff's claims.

1. The plaintiff's primary claim on appeal is that the judge erred in applying the "ministerial exception" to this case, because the challenged employment decisions do not implicate religious beliefs, procedures, or law. She asserts an entitlement to the opportunity to prove that any assertion of a legitimate motive on the defendants' part is a pretext, and that she was constructively discharged solely because she is female. The plaintiff argues that courts should afford an aggrieved minister the same protections provided to plaintiffs in secular employment settings to investigate claims of illegal discrimination in the workplace. The plaintiff contends that the rule applied by the judge, which arbitrarily excludes employment discrimination claims by a minister against a church regardless of their basis, will lead to a situation where "any church and minister, no matter how outrageous and illegal the conduct, will be granted a license to flagrantly violate the discrimination laws of Massachusetts without repercussions."

It is not necessary that we respond to the plaintiff's specific contentions regarding the "ministerial exception." The First Amendment states that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof." The principle that this language precludes jurisdiction of civil courts over church disputes touching on matters of doctrine, canon law, polity, discipline, and ministerial relationships is firmly established in Massachusetts case law. See *Parish of the Advent* v. *Protestant Episcopal Diocese of Mass.*, 426 Mass. 268, 280 (1997); *Fortin* v. *Roman Catholic Bishop of Worcester*, 416 Mass. 781, 785, cert. denied, 511 U.S. 1142 (1994); *Murphy* v. *I.S.K.Con. of New England, Inc.*, 409 Mass. 842, 850, cert. denied, 502 U.S. 865 (1991); *Wheeler* v. *Roman Catholic Archdiocese of Boston*, 378 Mass. 58, 61, cert. denied, 444 U.S. 899 (1979). The facts alleged in the plaintiff's complaint and supporting affidavit present a quintessential example of such a church dispute. The plaintiff's resignation appears to have been motivated, essentially, by her frustration

over the direction of her ministry and the perceived value placed on it by her superiors. A trial on this matter clearly would involve assessment of the church's priorities of its ministries and require the defendants to defend the church's policies regarding its ministers. Thus, jurisdiction is precluded in this case, regardless of whether we adopt the "ministerial exception."

It is true that the plaintiff's claims do not, on their face, question the verity of religious doctrines or beliefs. It is hard to conceive, however, how a court could inquire into the reasons for the defendants' decisions regarding the plaintiff's ministry without intruding into matters of the internal management of the Diocese.[3] Irrespective of whether the defendants' treatment of the plaintiff and her ministry was based on legitimate or illegitimate grounds, the plaintiff's claims, by their very nature, implicate the defendants' First Amendment rights. To argue otherwise diminishes the importance of the constitutional separation of church and State.

We reject the plaintiff's contention that a balancing test is appropriate to determine to what extent judicial scrutiny of her claims would offend the defendants' religious freedoms under either the establishment clause, see *Lemon* v. *Kurtzman*, 403 U.S. 602, 612-613 (1971), or the free exercise clause, see *Sherbert* v. *Verner*, 374 U.S. 398, 407 (1963), of the First Amendment. The application of First Amendment principles, in circumstances such as these, involves no balancing test. If adjudication of the plaintiff's claims would implicate matters of ecclesiastical relationships, the courts should not intrude. See

---

[3]One commentator has described the relationship between a church and its employees as follows: "[C]hurches rely on employees to do the work of the church and to do it in accord with church teaching. When an employee agrees to do the work of the church, he must be held to submit to church authority in much the same way as a member. . . . The state may not intervene to protect employees from treatment that is merely arbitrary or unfair; the remedy for that is to resign or renegotiate the terms of employment. Modern labor legislation may have deprived secular employers of the fiduciary duty once owed them by their rank and file employees, but to deprive the churches of that duty would be to interfere with an interest protected by the free exercise clause." Laycock, Towards a General Theory of the Religion Clauses: The Case of Church Labor Relations and the Right to Church Autonomy, 81 Colum. L. Rev. 1373, 1408-1409 (1981), quoted approvingly in *Madsen* v. *Erwin, supra* at 724.

*Madsen* v. *Erwin,* 395 Mass. 715, 722-723 (1985) ("the decision to fire [the plaintiff] can only be construed as a religious one, made by a Church as employer"); *Alberts* v. *Devine,* 395 Mass. 59, 72-73, cert. denied sub nom. *Carroll* v. *Alberts,* 474 U.S. 1013 (1985) ("It is clear that the assessment of an individual's qualifications to be a minister, and the appointment and retirement of ministers, are ecclesiastical matters entitled to constitutional protection against judicial or other State interference"); *Natal* v. *Christian & Missionary Alliance,* 878 F.2d 1575, 1578 (1st Cir. 1989) (no jurisdiction over minister's claim of wrongful termination, notwithstanding allegation that organization failed to follow own rules; "[b]y its very nature, the inquiry . . . plunges an inquisitor into a maelstrom of Church policy, administration, and governance"); *Dowd* v. *Society of St. Columbans,* 861 F.2d 761, 764 (1st Cir. 1988) ("actions involv[ing] rules, policies, and decisions [] should be left to the exclusive religious jurisdiction of the church").

The plaintiff's attempts to frame this action as a secular dispute pertaining to the defendants' "unlawful acts in violation of their own company policies and procedures specifically enacted . . . to prohibit discrimination of any type against its employees" is unavailing.[4] That the Diocese may have acted in violation of antidiscrimination policies set forth in its own personnel handbook is irrelevant. We decline to venture into the realm of interpreting internal guidelines and procedures that have been adopted by the Episcopal Church. As discussed above, a church must be free to decide for itself what its obligations to its ministers are, without being subject to court interference. See *Dowd* v. *Society of St. Columbans, supra* at 764 ("The [Diocese's] own internal guidelines and procedures

---

[4]In pursuit of this argument, the plaintiff relies on the decision of *Geary* v. *Visitation of the Blessed Virgin Mary Parish Sch.,* 7 F.3d 324, 329 (3d Cir. 1993), in which the United States Court of Appeals for the Third Circuit allowed judicial inquiry into whether the discriminatory conduct alleged in the plaintiff's complaint was actually motivated by sincerely held religious belief. The *Geary* case is easily distinguishable, however, because the plaintiff in that case was a lay teacher who sued a religious school, not an Episcopal minister suing her Diocese. Cf. *Minker* v. *Baltimore Annual Conference of United Methodist Church,* 894 F.2d 1354, 1356-1357 (D.C. Cir. 1990) (rejecting minister's age discrimination claim, stating "determination of 'whose voice speaks for the church' is per se a religious matter").

must be allowed to dictate what its obligations to its members are without being subject to court intervention").[5]

2. One final point merits discussion. The plaintiff's counsel, at oral argument, suggested that the plaintiff's claim involves prohibited conduct of a sexual nature. This basis for the plaintiff's claim was not, apparently, presented to the judge, nor was it developed in the plaintiff's brief submitted to this court. It is true that the plaintiff's complaint states a claim of "gender harassment," as well as for gender discrimination, against the Bishop and the Diocese. In her supporting affidavit, however, although the plaintiff stated that the Bishop's predecessor treated her in an "uncomfortably 'friendly' " manner and that he "put his arm around [her] several times, something he never did to men," she also stated that he made no "overt sexual advances." Importantly, she described his attitude toward her as merely "patronizing and condescending." There is nothing in the record[6] to support an inference of conduct that could properly be characterized as sexual harassment for purposes of G. L. c. 151B.[7] This case does not present the question, therefore, considered by the United States Court of Appeals for the Ninth Circuit in *Bollard* v. *California Province of the Soc'y of Jesus*, 196 F.3d 940 (9th Cir. 1999), whether the First Amendment

---

[5]The record shows that personnel policies of the Diocese contain mechanisms whereby employees can seek to resolve problems. The plaintiff, presumably, was free to pursue her claims of discrimination through any procedures provided by the Diocese.

[6]We disregard entirely conclusory statements in the plaintiff's affidavit that she once told a member of the committee on clergy sexual misconduct and an archdeacon that she believed that "[the Bishop's predecessor] had misused his power in [their] relationship and that, while [she] never entered into a sexual relationship with him, he was nonetheless abusive to [her]."

[7]General Laws c. 151B, § 1 (18), defines sexual harassment as:

"[S]exual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature when (*a*) submission to or rejection of such advances, requests or conduct is made either explicitly or implicitly a term or condition of employment or as a basis for employment decisions; (*b*) such advances, requests or conduct have the purpose or effect of unreasonably interfering with an individual's work performance by creating an intimidating, hostile, humiliating or sexually offensive work environment."

provides a complete barrier to a minister's complaints of conduct by church superiors that properly could be characterized as sexual harassment in the context of an employment discrimination claim. See *id.* at 949-950 (considering plaintiff's claims of sexual harassment by church; allowing limited inquiry into whether Jesuit order exercised reasonable care to prevent and correct sexual harassment, and whether plaintiff failed to take advantage of opportunities to limit harm).

The First Amendment, as applied to the States by the Fourteenth Amendment to the United States Constitution, requires courts of this Commonwealth "to ensure that individuals or organizations are not unjustly deprived of their right to exercise freely their religious beliefs." *Murphy* v. *I.S.K.Con. of New England, Inc.,* 409 Mass. 842, 850 (1991). To the extent that this case involves a conflict between the legislative mandate of G. L. c. 151B to eliminate discrimination in the workplace and our constitutional mandate to preserve the separation of church and State, the constitutional directive must prevail.

3. We treat the judgment that was entered as a judgment under Mass. R. Civ. P. 12 (b) (1) and, so treated, the judgment is affirmed.

*So ordered.*