EUCLEY WOOTEN & others[1] *vs.* CORNELIA CRAYTON & others.[2]

No. 05-P-41.

Plymouth. December 8, 2005. - April 24, 2006.

Present: DUFFLY, SMITH, & COHEN, JJ.

*Jurisdiction,* Ecclesiastical controversy. *Corporation,* Religious. *Church. Religion. Constitutional Law,* Freedom of religion.

In a civil action between two factions of a congregational church, the judge erred in dismissing, for lack of subject matter jurisdiction, the plaintiffs' complaint for declaratory and injunctive relief, where the court had limited jurisdiction to inquire into the allocation of authority within the church and to accord deference to the decisions of the organizational authority; because the uncontroverted facts permitted this court to ascertain that the authority of the church lay in its membership and that there was no basis to infer that the membership had not expressed its will on the issues in question, this court concluded that the defendants were entitled to a judgment declaring that the actions and decisions of which the plaintiffs complained were authorized by the membership and that the plaintiffs were not entitled to relief. [193-199]

CIVIL ACTION commenced in the Superior Court Department on February 14, 2001.

The case was heard by *Linda E. Giles,* J., on motions for summary judgment.

*David Berman* for the plaintiffs.

*William P. McGovern Jr. (James T. Scamby* with him) for the defendants.

COHEN, J. In this case involving a dispute between two factions of a congregational church, we consider the plaintiffs' ap-

[1]Ruth Thompson, Cindy Campbell, Richard Solomon, Michael Barrow, Yvonne Winston, David Johnson, Irene Brito, Donna Stokes, and Jerome Custard.

[2]Jamala Mathis, Eugenia Davis, Samuel Campbell, Tiesha Crayton, Clement Donovan, Kia Houston, Tarsha Houston, Dellarita Gaskins, and Huston Crayton, Jr.

peal from the dismissal, on jurisdictional grounds, of their complaint for declaratory and injunctive relief. The plaintiffs are ten long-standing members of Lincoln Congregational Church (LCC), an independent congregational parish located in Brockton. The defendants are the pastor and nine church members who presently serve as officers and trustees of LCC.[3] The plaintiffs claim that the defendants acted in violation of LCC's by-laws when they scheduled votes by the membership to change the denominational affiliation of LCC and authorize certain real estate transactions. At issue is whether, and for what purpose, the civil courts may entertain the case, consistent with the free exercise and establishment clauses of the First Amendment of the United States Constitution.

1. *Procedural background.* On February 14, 2001, the plaintiffs filed their complaint for declaratory and injunctive relief, claiming that they, and not the defendants, have the right to control and possess the real and personal property owned by LCC. The plaintiffs allege, and it is not controverted, that throughout most of its existence, LCC was a member in good standing of the Massachusetts Conference of the United Church of Christ (UCC). They contend that, in violation of church by-laws, the defendants caused LCC to purchase land for a new church that will be aligned with the American Baptist Church Conference (ABCC), to pay architectural fees for the design of the new church, and to raise money for these purposes by mortgaging existing church property. The plaintiffs ask the court to declare that they, and not the defendants, have the right to control LCC's property, that certain votes of the congregation are null and void, and that LCC remains an independent congregation in union with the UCC. In addition, the plaintiffs seek an injunction prohibiting the defendants from using and dissipating the assets of LCC for purposes that contravene the church's by-laws, from alienating church property, and from interfering with the plaintiffs' participation in church affairs. The plaintiffs also request an order that the defendants turn over the keys of the church to the plaintiffs and reimburse LCC for

---

[3]Because the defendants do not raise the issue, we do not consider whether the corporation should have been joined as a necessary party to the case.

all funds expended by the defendants in violation of the by-laws.

In response to the complaint, the defendants answered and filed a counterclaim requesting a declaratory judgment that the plaintiffs are not entitled to any of the relief requested.[4] The defendants assert that they were duly selected to hold their positions at LCC, that the plaintiffs were voted out of office by the membership, and that the decisions questioned by the plaintiffs — to leave the UCC, join the ABCC, and move LCC to new, larger quarters — were authorized by the church membership.

In late September, 2001, the plaintiffs successfully moved for approval of a memorandum of lis pendens to be placed on LCC real estate. Despite several attempts by the defendants to dissolve the lis pendens at various stages of the case, the docket reflects that it has remained in place pending appeal.

On December 31, 2003, the parties filed cross motions for summary judgment, supported by affidavits, deposition excerpts, and other documents.[5] These motions were directed to the merits of the parties' dispute and not to subject matter jurisdiction. The motions were argued and taken under advisement on April 5, 2004. On May 18, 2004, the Supreme Judicial Court issued its decision in *Callahan* v. *First Congregational Church of Haverhill*, 441 Mass. 699 (2004) (hereafter *Callahan*), which held that "congregational as well as hierarchical churches are entitled to autonomy 'over church disputes touching on matters of doctrine, canon law, polity, discipline, and ministerial relationships.' " *Id.* at 708, quoting from *Williams* v. *Episcopal Diocese of Mass.*, 436 Mass. 574, 579 (2002). Relying upon *Callahan*, the motion judge ruled, in a decision dated June 23, 2004, that the court was required to refrain completely from intervening in the dispute.

In reaching her decision, the motion judge applied summary

[4]The copy of the defendants' counterclaim that appears in the record appendix is missing the last page. We have exercised our discretion to obtain a complete copy from the Superior Court. See Mass.R.A.P. 18(a), as amended, 425 Mass. 1602 (1997).

[5]For reasons that are unexplained, the plaintiffs filed two separate motions: a motion for partial summary judgment on the issue of title to church property, and a separate motion for summary judgment on all counts of the plaintiffs' complaint.

judgment standards, determining that there were no genuine issues of material fact and that the defendants were entitled to judgment as matter of law. See *Kourouvacilis* v. *General Motors Corp.*, 410 Mass. 706, 713-714 (1991). Accordingly, she dismissed the case for lack of subject matter jurisdiction by entering an order denying summary judgment to the plaintiffs and granting summary judgment to the defendants.[6]

2. *Facts.* The facts relevant to the jurisdictional issue are undisputed and may be summarized as follows. LCC is an independent, denominationally congregational church founded in 1897. On June 3, 1901, LCC was chartered as a religious corporation, pursuant to St. 1887, c. 404 — a statute that is now codified as G. L. c. 67, §§ 47-54.[7] At an undetermined time prior to 1983, LCC chose to become affiliated with the UCC. This relationship did not affect LCC's congregational independence, because the constitution of the UCC recognizes the autonomy of affiliated local churches.

The by-laws of LCC, as revised in June, 1983, explicitly referred to LCC's affiliation with the UCC. Article I (name) stated that the name of the church shall be "Lincoln Congrega-

---

[6]It bears reiterating that it can be problematic to consider the issue of subject matter jurisdiction using principles applicable to summary judgment motions under Mass.R.Civ.P. 56, 365 Mass. 824 (1974). See *Callahan, supra* at 710-711. Doing so gives the plaintiff the benefit of a more favorable standard than that applicable under Mass.R.Civ.P. 12(b)(1), 365 Mass. 754 (1974), which governs motions to dismiss for lack of subject matter jurisdiction. As in summary judgment proceedings, when a rule 12(b)(1) motion is filed, the judge may consider documents, affidavits and other materials outside the pleadings. *Callahan, supra.* But in contrast to the treatment of disputed facts in summary judgment proceedings, disputed facts presented on a rule 12(b)(1) motion are not viewed in the light most favorable to the nonmoving party. Instead, if the defendant makes a supported, factual challenge to subject matter jurisdiction, the court is required to address the merits of the jurisdictional claim by resolving any factual disputes between the plaintiff and the defendant. *Ibid.* In that process, the plaintiff bears the burden of proving jurisdictional facts to support each of the plaintiff's claims. *Ibid.* See *Williams* v. *Episcopal Diocese of Mass.*, 436 Mass. 574, 577 n.2 (2002). In this case, because the judge ruled against the plaintiffs even under standards more favorable to them, and because, in any event, the relevant jurisdictional facts are not in dispute, nothing of consequence flows from the judge's use of summary judgment principles to decide the case.

[7]Statute 1887, c. 404, was first codified as R. L. c. 36, §§ 47-54. In both the 1921 and 1932 versions of the General Laws, the same statute was codified as G. L. c. 67, §§ 47-54.

tional Church, United Church of Christ . . . ." Article III (polity) provided, in § 1, that LCC "shall be a part of" the UCC, sustaining a relationship with that body as described in the UCC's constitution and by-laws.

LCC's 1983 by-laws also stated that its governance would reside in its members. Article III, § 2, provided that "[t]he government of [LCC] shall be vested in its members, who exercise the right of control in all its affairs, subject, however, to the General Laws of Massachusetts, Chapter 67, relating to the incorporation of churches." Article VI (governing body) elaborated further, stating, in § 1, that "[t]he governing body of this church shall be the membership assembled in church meeting. The vote of a majority of members present at the meeting shall be the action of the church except in the matters relating to the purchase, sale, mortgage, lease, or transfer of the real property of the church, and the calling of ministers, in which cases action shall require a two-thirds vote of the active members present and voting." Pursuant to art. VII of the by-laws, however, certain executive functions were delegated to a council (LCC council) composed of the minister, the elected officers, representatives of each of the boards of administration, and three at-large members.

In 1993, a committee of members drafted new by-laws for LCC, but a somewhat different set of revisions eventually was adopted by vote of the congregation at a church meeting held on January 28, 1995. The by-laws adopted in 1995 were different from the 1983 by-laws in only a few respects.[8] Among the many provisions that were not changed were art. I (name), art.

---

[8] We have made our own comparison of the 1983 and 1995 by-laws as they appear in the record appendix, because, in various places in their brief, the plaintiffs have confused the 1993 draft by-laws with the 1995 by-laws that were adopted after vote by the membership. As far as we can discern, the only differences between the 1983 by-laws and the 1995 by-laws are as follows: art. VI was amended to increase the number of active members needed to provide a quorum from ten to twenty; a new provision, art. VII, § 8, was added to provide for an annual audit of LCC's financial records; art. VIII (boards of administration) was amended to change the number of church deacons from "four to seven members" to "a minimum of seven members"; art. VIII was also amended to require that church education programs "be taught according to Timothy II, 3:16, 17 and Revelations 22:18, 19"; and finally, art. X was amended to change the date of LCC's annual meeting from October to January.

III (polity), and, except for increasing the number of members required for a quorum, all provisions relating to church governance. Thus, the name of the church remained Lincoln Congregational Church, United Church of Christ; LCC's stated affiliation with the UCC remained in place; and church governance remained vested in the membership, exercising its authority at church meetings.[9]

In the spring of 1996, the continued affiliation of LCC with the UCC became a matter of concern. Increasingly unhappy with the UCC's liberal theology, including its positions on gay rights and abortion, the LCC council met, on April 27, 1996, to discuss disaffiliating from the UCC. At that meeting, the LCC council decided to bring the issue of disaffiliation to the church membership. As a result, on June 8, 1996, a church meeting was convened where fourteen of the twenty-two members in attendance voted to disaffiliate from the UCC. On June 14, 1996, the minister, moderator, and clerk of LCC wrote a letter to the UCC informing that organization of LCC's decision. For approximately four years thereafter, the church did not maintain an affiliation with any umbrella organization.

On June 5, 1999, the LCC council voted to recommend to the membership that LCC purchase land upon which to build a new church. A church meeting was held on September 22, 1999, at which twenty-four of the twenty-nine members present voted to approve the building of the new church, and twenty-seven of those in attendance voted to use the equity in the existing church property for this purpose. Approximately six months later, on March 6, 2000, another church meeting was held at which thirty-seven of the forty-nine members in attendance voted to affiliate

---

[9]Also unchanged in the 1995 by-laws were the provisions governing by-law amendment. In both the 1983 and 1995 versions, art. XI provided that the "By-laws may be amended by a two-thirds vote at any regular or special meeting provided that a notice specifying the time of the meeting and the substance of the proposed amendment shall have been given from the pulpit or printed in the calendar on the two Sundays immediately preceding said meeting; except that By-Laws I to VI may be amended only by a two-thirds vote of the resident church members present at an annual meeting, the proposed amendment having been said before the church in writing not less than two months previously, having been read before the congregation on three consecutive Sundays preceding such annual meeting, and copies having been made available to the members of the church."

with the ABCC. Three of the plaintiffs were among those listed on the attendance sheet for this meeting.

After the building committee located a desirable property elsewhere in Brockton, the LCC council voted, on June 13, 2000, to recommend that this property be purchased. On June 20, 2000, a church meeting was held at which fifty-five of the sixty members in attendance voted to accept the recommendation. On August 14, 2000, the trustees of LCC gave their consent to the transaction and authorized two of the defendants, Samuel Campbell and Eugenia Davis, to sign a purchase and sale agreement, mortgage and loan documents, and any other documents necessary for the purchase. On December 27, 2000, Campbell and Davis effectuated the purchase of the new property, financing it to a large extent by giving the seller a mortgage on the existing church real estate.

3. *Discussion.* The parties' positions on jurisdiction may be summarized as follows. The plaintiffs maintain that the case is simply a nontheological dispute over the right to control the real and personal property of the church, and that it therefore may be decided using neutral principles of law.[10] According to the plaintiffs, the by-laws of a church, like the by-laws of any private association or corporation, are a contract that the courts may enforce; thus, the courts may determine whether the defendants adhered to the procedural requirements of LCC's by-laws in bringing certain votes to the membership,[11] and, if they did not, may set aside the challenged votes in the same

[10]The United States Supreme Court has determined that the First Amendment to the United States Constitution permits, but does not require, States to decide church property disputes using neutral principles of law. See *Jones* v. *Wolf*, 443 U.S. 595, 602-603 (1979).

[11]The particular votes in question are the vote to amend the by-laws in 1995, the vote to disaffiliate with the UCC in 1996, the vote to authorize the building of a new church using the equity in the old church in 1999, and the vote to affiliate with the ABCC in 2000. Among other things, the plaintiffs claim that the votes concerning affiliation were de facto votes to amend arts. I and III of the by-laws, by changing the name and polity of the church. According to the plaintiffs, these votes must be nullified because, contrary to the requirements of art. XI, they were not taken at an annual meeting and sufficient advance notice was not given to the members. See note 9, *supra*. For example, the plaintiffs claim that the proposal to affiliate with the ABCC was read to the congregation on only two successive Sundays prior to the vote, rather than three.

way that courts may set aside procedurally defective decisions of nonreligious organizations.

The defendants argue that despite the plaintiffs having framed the case as one involving control over church property and alleged procedural infractions, the parties' core disagreement is over doctrinal beliefs. Thus, according to the defendants, any court consideration of the case would impermissibly lead to entanglement in an essentially religious controversy. The only proper course, in the defendants' view, is dismissal of the entire case for lack of jurisdiction.

We are unpersuaded by either of the parties' positions. The plaintiffs' contention that this is merely a nontheological property dispute is an oversimplification. While this lawsuit has implications for the control of LCC's real and personal property, it plainly is colored by differences of opinion over doctrine and polity. Moreover, there is no disagreement about the actual ownership of church property, which, both sides agree, resides in LCC. Fundamentally, this case is about wider questions of church governance — whether the defendants were duly authorized by the congregation to effectuate a change in LCC's affiliation and to mortgage the existing church for the sake of building a new, Baptist church. Our courts have refused to characterize church governance cases, even when they relate to the control of church property, as purely secular matters susceptible to resolution by the civil courts using neutral principles of law. See *Parish of the Advent* v. *Protestant Episcopal Diocese of Mass.*, 426 Mass. 268, 283-284 (1997); *Episcopal Diocese of Mass.* v. *DeVine*, 59 Mass. App. Ct. 722, 728 (2003).

In any event, the plaintiffs are mistaken in assuming that our courts are freer to intervene if an internal church dispute concerns property rights. Any suggestion to that effect was put to rest by the Supreme Judicial Court in *Wheeler* v. *Roman Catholic Archdiocese of Boston*, 378 Mass. 58, 63-64, cert. denied, 444 U.S. 899 (1979). Even though *Wheeler* involved a hierarchical church organization, after *Callahan*, that principle is equally apt here.

The defendants' position — that the courts have no role to play when confronted with a disagreement between church fac-

tions with differing theological views — also sweeps too broadly. To be sure, the courts may not resolve or take sides on religious matters; but that is not to say, even in the wake of the *Callahan* decision, that the courts lack jurisdiction to address any aspect of a dispute between factions competing for control of a congregational church.[12]

Before *Callahan* was decided, Massachusetts case law indicated that the nature and degree of court involvement in such cases would turn upon the organizational structure of the church. It was thought, as indicated by the United States Supreme Court's decision in *Serbian E. Orthodox Diocese for the U.S. & Can.* v. *Milivojevich*, 426 U.S. 696, 709 (1976), that civil courts "must tread more cautiously" when confronting cases involving hierarchical, as opposed to congregational churches. *Parish of the Advent* v. *Protestant Episcopal Diocese of Mass.*, 426 Mass. at 280-281, quoting from *Antioch Temple, Inc.* v. *Parekh*, 383 Mass. 854, 861 (1981). Thus, if the religious organization in question was hierarchical, the courts would not independently decide issues touching on church governance, including whether church authorities had adhered to their own procedures; however, the courts would exercise jurisdiction for the purposes of ascertaining how the church was organized, identifying the authority to whom deference was due, and enforcing the resolution of internal church disputes by that authority. See *Wheeler* v. *Roman Catholic Archdiocese of Boston*, 378 Mass. at 62; *Episcopal Diocese of Mass.* v. *DeVine*, 59 Mass. App. Ct. at 728-729.

---

[12]Judicial intervention in such cases has a long history in the United States. See generally Pfeffer, Judicial Intervention in Disputes Over the Use of Church Property, 75 Harv. L. Rev. 1142 (1962); Venable, Courts Examine Congregationalism, 41 Stan. L. Rev. 719, 722-727 (1989). Throughout much of that history, court involvement was, by today's standards, remarkably intrusive. In the early nineteenth century, for example, a church schism was likely to be resolved by application of the implied trust doctrine, pursuant to which the courts would examine church doctrine and award control of church property to the faction that continued to adhere to the rules, practices, and usages of the church before the controversy arose. See, e.g, *Stebbins* v. *Jennings*, 10 Pick. 172 (1830). We note that, even though the implied trust doctrine has long been discredited, see *Watson* v. *Jones*, 80 U.S. (13 Wall.) 679, 725 (1872), the plaintiffs argued below in support of their motion for partial summary judgment that, as the "adhering minority," they should be granted control of LCC's property.

If, on the other hand, the religious organization in question was congregational, the courts would go farther and review the regularity of church decision-making, including the organization's compliance with its articles of organization and by-laws. See *Antioch Temple, Inc.* v. *Parekh*, 383 Mass. at 865; *Primate & Bishops' Synod of the Russian Orthodox Church Outside Russia* v. *Russian Orthodox Church of the Holy Resurrection, Inc.*, 35 Mass. App. Ct. 194 (1993), *S.C.*, 418 Mass. 1001 (1994), cert. denied, 513 U.S. 1121 (1995).

In *Callahan*, *supra*, the Supreme Judicial Court clarified that churches of congregational polity are no less entitled to autonomy over their internal decision-making than hierarchical churches, although it did so not in the context of a dispute between church factions, but in an employment dispute between an interim pastor and the congregational church that had dismissed him. Previously, the court had decided that it was constitutionally impermissible to become entangled in the decision-making of a hierarchical church regarding the employment of its minister. See *Williams* v. *Episcopal Diocese of Mass.*, 436 Mass. 574, 579-581 (2002). Seeing no reason to differentiate between hierarchical and congregational churches in such matters, the court ruled in *Callahan* that the civil courts lacked subject matter jurisdiction to consider any of the plaintiff's claims against the church or its officers arising from the disciplinary review process that they had initiated against him, including the plaintiff's claims that the defendants had failed to follow their own written procedures.[13] *Callahan*, *supra* at 711-715.

The question remains how the principles enunciated in *Callahan* play out in a case involving a factional dispute over the control of a congregational church and its property. As previously discussed, when a disagreement of this sort arises in a church of hierarchical polity, our courts do not entirely eschew jurisdiction. Rather, in recognition that there is a secular interest in facilitating a peaceful solution, we exercise jurisdiction to the limited extent of identifying the authority to whom deference is due, and enforcing the resolution of the conflict by that

[13]A defamation claim unrelated to the disciplinary process was permitted to go forward. *Callahan*, *supra* at 716-717.

authority. *Episcopal Diocese of Mass.* v. *DeVine*, 59 Mass. App. Ct. at 729. Indeed, court intervention may be even more justifiable when a dispute over control has erupted in a congregational church. By definition, a congregational church can turn to no supervising church institution to adjudicate the conflict. Thus, court intervention may be the only viable means for the parties to resolve their differences.

We therefore do not read *Callahan, supra,* to prohibit the courts from playing any role in cases where factions are vying for control of a congregational church. Significantly, even though the court in *Callahan* expressly overruled *Antioch Temple, Inc.* v. *Parekh,* 383 Mass. at 864-865, insofar as that case relied upon a polity-based test, see *Callahan, supra* at 709, the court did not completely disavow *Antioch.* Instead, the court reiterated one of the justifications it had given in *Antioch* for affirming a declaratory judgment upholding the authorized actions of the church's board of directors — that doing so did "no more than honor the decisions of the governing body of a congregational church." *Callahan, supra* at 707, quoting from *Antioch Temple, Inc.* v. *Parekh, supra* at 865. We take that to mean that, after *Callahan,* the courts have jurisdiction to consider factional disputes over control of congregational churches in the same circumscribed way that they may consider similar disputes in hierarchical churches — by inquiring into the allocation of authority within the church and according deference to the decisions of its highest authority — the only difference being that a more thorough inquiry may be needed to identify organizational authority in a congregational church. See Laycock, Towards a General Theory of the Religion Clauses: The Case of Church Labor Relations and the Right to Church Autonomy, 81 Colum. L. Rev. 1373, 1413-1414 (1981).[14]

It follows that it was error to dismiss the case for lack of subject matter jurisdiction, because there was a limited inquiry for the court to conduct. We need not remand the case to the

---

[14]This article has been cited with approval by the Supreme Judicial Court on a number of occasions. See *Madsen* v. *Erwin,* 395 Mass. 715, 723-724 (1985); *Williams* v. *Episcopal Diocese of Mass., supra* at 580 n.3; *Callahan, supra* at 705 n.8 & 708. Although the author focuses upon church labor relations law, his broader analysis of a right of church autonomy extends beyond that category of cases and provides useful guidance here.

Superior Court for this purpose, however, because the uncontroverted facts allow us to conclude that the defendants are entitled to a declaratory judgment in their favor. In this case, the ultimate governing authority to which we must defer is readily apparent and uncontested. In keeping with congregational tradition and as expressed in LCC's by-laws, LCC's governance resides in its membership. More particularly, as set forth in art. VI, § 1 of the by-laws, "[t]he governing body of this church shall be the membership assembled in church meetings. The vote of a majority of members present at the meeting shall be the action of the church except in the matters relating to the purchase, sale, mortgage, lease, or transfer of real property of the church, and the calling of ministers, in which cases action shall require a two-thirds vote of the active members present and voting."

While we can conceive of cases where it might be necessary to look more closely at the decision-making process of a congregational church in order to determine where church authority is vested and whether that authority has expressed its will, this is not such a case. It is not controverted that each of the decisions to which the plaintiffs object was voted upon by the membership at meetings where a quorum was present, and that each decision was endorsed by the required margin. Although the plaintiffs take issue with the notice and timing of various meetings, they make no showing that, because of these deficiencies, the votes did not accurately reflect the desires of the membership. To the contrary, the plaintiffs have acknowledged that their views are in the minority. See note 12, *supra.* Having ascertained that the authority of LCC lies in its membership, and having no basis to infer that the membership did not express its will on the issues in question, we scrutinize the case no further. In these circumstances, whether there was full compliance with internal church procedures or not, we will not question the decisions of LCC's authoritative body. Instead, as requested by the defendants in their counterclaim, we will enforce those decisions by declaring them to be valid.

4. *Disposition.* The defendants are entitled to a declaratory judgment in their favor. The case is remanded to the Superior Court for entry of a declaration that the actions and decisions of

which the plaintiffs complain were authorized by the member-ship and that the plaintiffs are not entitled to relief.[15]

*So ordered.*

---

[15]In view of our decision, the defendants are entitled to have the lis pen-dens on LCC real estate dissolved.