JOSETTE AUDOIRE & another[1] *vs.* CLIENTS' SECURITY BOARD.

Worcester. November 8, 2007. - January 10, 2008.

Present: MARSHALL, C.J., GREANEY, SPINA, COWIN, CORDY, & BOTSFORD, JJ.

*Clients' Security Board. Assignment. Attorney at Law,* Attorney-client relationship.

A decision by the Clients' Security Board to condition a reimbursement award on an applicant's execution of an assignment agreement was not subject to judicial review, where such applicant did not have a justiciable or material right to any payment from the Clients' Security Fund. [392]

A Superior Court judge properly dismissed a civil action brought by an applicant to the Clients' Security Fund and her attorney seeking a declaration that an assignment agreement into which the applicant, without the advice of counsel, had entered with the Clients' Security Board was invalid, where the plaintiffs failed to provide facts or legal authority to support the claim as one on which relief could be granted [392-393]; similarly, nothing supported the claim that the applicant lacked the capacity to execute the agreement [393-394].

CIVIL ACTION commenced in the Superior Court Department on July 10, 2006.

A motion to dismiss was heard by *Francis R. Fecteau,* J.

The Supreme Judicial Court on its own initiative transferred the case from the Appeals Court.

*Michael J. Walsh* for the plaintiffs.

*Christine Baily,* Assistant Attorney General, for the defendant.

CORDY, J. As we discussed in *Indeck* v. *Clients' Sec. Bd., ante* 379, 379 (2008), the purpose of the Clients' Security Fund (Fund) is to "discharge, as far as practicable and in a reasonable manner, the collective professional responsibility of the members of the Massachusetts bar with respect to losses caused to the public by defalcation of members of the bar, acting either as attorneys or as fiduciaries." S.J.C. Rule 4:04, as amended, 428 Mass. 1302 (1998). The responsibility for effectuating this

[1]Michael J. Walsh.

purpose rests with the Clients' Security Board (board), which has substantial discretion in determining whether or not to honor, pay, or reject claims for reimbursement. S.J.C. Rule 4:05, § 1, as amended, 440 Mass. 1349 (2004). "All reimbursements shall be a matter of grace, not right, and no client . . . or other person [has] any right or interest in the Fund." *Id.*

In exercising its discretion to make an award from the Fund, the board may require "any applicant, as a condition of any payment from the Fund . . . to enter into such agreements as the Board may direct, including assignments, [and] subrogation agreements." S.J.C. Rule 4:05, § 4, as appearing in 422 Mass. 1301 (1996).[2] The principal question posed in this case is whether the board's decision to condition a reimbursement award on an applicant's execution of an assignment agreement is subject to judicial review. We conclude that it is not. We also conclude that the plaintiffs' complaint, which seeks a declaration that the assignment executed in this case is invalid, fails to state a claim on which relief can be granted and was properly dismissed.

1. *Procedural history.* On July 10, 2006, Josette Audoire (an applicant for reimbursement) and Michael Walsh (the attorney representing the applicant in civil proceedings against her former defalcating attorney) brought suit against the board in the Superior Court, asserting that an assignment agreement entered into between the board and Audoire was both "void and contrary to public policy" because it was "induced by threat of delayed distribution" and entered into "without advice of counsel"; and invalid because a preexisting contingency fee arrangement between Walsh and Audoire deprived her of the capacity to execute it.

The board moved to dismiss the complaint for lack of subject

---

[2]Supreme Judicial Court Rule 4:05, § 4, as appearing in 422 Mass. 1301 (1996), reads:

> "In addition to other conditions and requirements, the Board may require any applicant, as a condition of any payment from the Fund, to execute such instruments, to take such action, and to enter into such agreements as the Board may direct, including *assignments*, *subrogation agreements*, trust agreements, and promises to cooperate with the Board in making and prosecuting claims or charges against any person. The Board may request individual lawyers and bar associations to assist it in the investigation of claims." (Emphasis added.)

matter jurisdiction and for failure to state a claim on which relief can be granted. The board's motion to dismiss was allowed "for the reasons expressed in the [board's] supporting memorandum."[3] The plaintiffs filed a timely notice of appeal, and we transferred the case from the Appeals Court on our own motion.

2. *Background.*[4] On May 8, 2002, Audoire filed a civil complaint against Attorney Shirley Hoak (and her law firm) who had, through a series of fraudulent investment schemes, misappropriated monies from a number of clients including over $200,000 from Audoire.[5] A settlement trust was formed to settle claims arising from the misconduct of Hoak and to distribute malpractice insurance proceeds to her former clients. Walsh initially represented Audoire in the civil proceedings against Hoak on a contingency fee basis.[6] This representation reached an "impasse" when Walsh sought "some security" for his fees and Audoire elected to participate in the settlement trust (thereby agreeing to dismiss her lawsuit) without notifying him.

---

[3]In its supporting memorandum the board contended, as it does here, that (1) S.J.C. Rule 4:05, § 1, as amended, 440 Mass. 1349 (2004), specifically precludes judicial review of any decision "to grant or deny reimbursement," and the subrogation and assignment agreements were part of that decision; (2) Attorney Walsh does not have standing to challenge the award because Rule 9 of the Rules of the Clients' Security Board (2007) holds that "[n]o part of any award of the Board shall be paid to any attorney acting on behalf of the claimant, and any attorney so acting shall do so as a public service"; and (3) the plaintiffs failed to state a claim on which relief can be granted.

[4]The facts set forth in this section are principally drawn from the allegations in the complaint, augmented by the documents filed by the parties in connection with the board's motion to dismiss pursuant to Mass. R. Civ. P. 12 (b) (1), 365 Mass. 754 (1974), for lack of subject matter jurisdiction. A judge, and logically a reviewing court, may consider documents and other materials outside the pleadings when ruling on a rule 12 (b) (1) motion. See *Callahan* v. *First Congregational Church of Haverhill*, 441 Mass. 699, 710 (2004); *Williams* v. *Episcopal Diocese of Mass.*, 436 Mass. 574, 577 n.2 (2002).

[5]Because of this misconduct, Hoak was disbarred on July 31, 2001.

[6]According to the contingency agreement between Walsh and Audoire, the fee arrangement was set at forty-nine per cent of any amounts recovered. The agreement contained a special provision regarding the board: "No fee shall [be] applied to funds received through the Mass. Board of Bar Overseers Clients' Security Board." That provision reflects the applicable board rule that "[n]o part of any award of the Board shall be paid to any attorney acting on behalf of the claimant, and any attorney so acting shall do so as a public service." Rule 9 of the Rules of the Clients' Security Board.

On December 16, 2003, while the settlement trust proceedings were ongoing, Audoire applied to the board seeking reimbursement of the funds that had been misappropriated by Hoak. In her application, Audoire stated that she was not represented by an attorney. She attached a letter to the application describing her disagreements with Walsh in the civil case, as well as a letter that she had written to Walsh, effectively terminating his services on September 22, 2003.[7]

On February 6, 2004, the trustee of the settlement trust sent Audoire a claim summary indicating that, as a preliminary determination, he had allowed a total of $203,414 against her claim of $257,622.22, and giving her twenty days to object. Audoire did not object, and the determination became final. Thereafter, Audoire received an initial distribution equal to twenty-five per cent of her allowed claim, or $50,583.50. The trustee also informed Audoire that subsequent distributions, if any, would be insignificant in relation to the amount of the initial distribution.

At its August 19, 2004, meeting, the board voted to make an award to Audoire in the amount of $152,560.50, the difference between the claim recognized by the settlement trustee ($203,414) and the trust's initial distribution ($50,853.50).[8] As was its practice, the board expressly conditioned the award on the execution of an assignment agreement, which would entitle it to future distributions from the settlement trust (up to the amount awarded by the board).[9] The assignment form was mailed to Audoire along

---

[7]Audoire and Walsh had several disagreements on how to proceed in their efforts to recover the defalcated money. The two disagreed over whether Audoire should join the settlement trust and dismiss her claim against Hoak's former law firm. Audoire also informed the board in her application that Walsh attempted to set up an alternative contingency fee agreement — which included placing a lien on her home — that she was to pay off from any recovery from the board. She did not agree to that arrangement, and stated that she represented herself in pursuing her claim before the board.

[8]Before the board made its distribution decision, Walsh sent the board a letter stating that he had represented Audoire in her lawsuit against Hoak and her law firm, and that "I understand she has filed a Claim for Reimbursement" with the board. He offered to provide the board with "any additional information or documentation that might not already have been provided" by Audoire. As a result of this letter, the board mistakenly entered Walsh's name into its computer system as Audoire's attorney.

[9]The board also required the execution of a subrogation agreement, not at issue here.

with notice of the board's award.[10] Audoire signed the agreement on August 27, 2004, returned it to the board, and shortly thereafter received a check in the amount of $152,560.50.

On December 13, 2004, Audoire "reaffirmed" her fee agreement with Walsh, who then continued to represent her "in relation to the Settlement Trust." On June 7, 2005, the trust notified Audoire that it would distribute $10,993.57 to her as the remainder of the insurance proceeds designated for her claim. The board claimed this distribution pursuant to its assignment agreement with Audoire. Walsh, on behalf of himself and Audoire, objected to these funds being distributed to the board. Walsh and the board agreed to place $10,993.57 in escrow pending the resolution of their dispute, and this action followed.

3. *Discussion.* When the board exercises its discretion to grant or deny, in whole or in part, a client's claim for reimbursement, that determination is not subject to judicial review because the claimant "does not have a justiciable or material right to any payment from the Fund." *Indeck* v. *Clients' Sec. Bd., ante* 379, 385 (2008). We consider the board's exercise of its discretion to condition an award on the claimant's execution of an assignment agreement, as integral to the board's determination of an applicant's claim, and similarly not a proper subject of judicial review.

Characterizing the execution of the assignment agreement as being "induced by threat of delayed distribution," that is, the "threat" of having to wait until a legally responsible party, such as the settlement trust, makes a distribution, does not give the plaintiffs' claim any additional traction. The decision of the board to make an award in advance of what may be a long-delayed distribution is a benefit to which Audoire has no right. Mounting a challenge to the imposition of a condition on that benefit, by characterizing it as a "threat," is merely a challenge to the board's underlying decision to impose the condition, a matter not subject to judicial review.

The plaintiffs' further claim that the assignment is void and

---

[10]Because of the board's having listed Walsh as Audoire's attorney, notice of this award and the assignment form were sent to Walsh, who apparently provided them to Audoire. Subsequently, the check was also sent to Walsh, who delivered it to Audoire.

unenforceable, because it was not secured "through the offices of her attorney" and consequently was "without advice of [her] counsel," was also properly dismissed. First, the factual allegations set out in the complaint to support this claim are to the contrary. Specifically, the complaint alleges that the attorney-client relationship between Audoire and Walsh reached an "impasse" over the terms of Walsh's representation, months before Audoire's application was submitted to the board. The complaint then further alleges that their agreement for representation was not "reaffirmed" by Audoire until December 13, 2004, long after the board made its award to her.[11] Second, and more important, the plaintiffs have offered no legal authority for the proposition that, in the absence of misrepresentation, unconscionability, or legally cognizable duress (none of which is alleged), an agreement executed by someone in Audoire's admitted position and circumstances "without the advice of counsel" is invalid or unenforceable as contrary to public policy. In other words, assuming all of the plaintiffs' allegations, read favorably to them, are true, they have not set forth a claim that would entitle them to relief. This is fatal to their claim, and the judge did not err in dismissing it.

Similarly, the plaintiffs have offered no authority (and we find none) to support their claim that Audoire lacked the "capacity" to execute the assignment in light of a previously signed contingency fee agreement between her and Walsh.[12] If Audoire violated an agreement she had with Walsh (a matter on which

---

[11]Although not relevant to the court's consideration of the board's motion to dismiss for failure to state a claim under Mass. R. Civ. P. 12 (b) (6), 365 Mass. 754 (1974), the fact that Walsh did not represent Audoire before the board is well documented in the materials presented to the Superior Court judge in connection with the board's motion to dismiss under rule 12 (b) (1). Those documents included Audoire's application to the board that enclosed her letter discharging Walsh and her statement confirming that he did not represent her. The complaint's allegations on the question whether the board secured the assignment not "through the offices of her attorney" are also troubling for another reason. The board, albeit mistakenly, sent to Walsh, as Audoire's attorney, the notice of her award and the assignment form for her to review and execute. If Walsh was her attorney, he surely had the opportunity to advise her with respect to these matters when he passed them on to her. In this regard, the plaintiffs' allegations are at best disingenuous.

[12]Walsh claimed that Audoire lacked "capacity" to enter into the assignment agreement because she could only do so by breaching their prior

we express no view), that may provide him with a claim against her, but neither party has alleged a viable claim against the board and the validity of the assignment.

*Judgment affirmed.*

contingency fee agreement. This claim misapprehends the meaning of "capacity" as it applies to contract law. "We have said that in an inquiry into capacity to contract, 'the true test is, was the party . . . in such a state of insanity at the time as to render him incapable of transacting the business.' " *Krasner* v. *Berk,* 366 Mass. 464, 467 (1974), quoting *Reed* v. *Mattapan Deposit & Trust Co.,* 198 Mass. 306, 314 (1908). Or "a contract may in some circumstances be voidable by reason of failure of will or judgment, where the person contracting, by reason of mental illness or defect, is unable to act in a reasonable manner in relation to the transaction." *Krasner* v. *Berk, supra* at 468. Audoire's "capacity" is not at issue here; there is no indication that she lacked the requisite understanding to enter into the assignment agreement.

Ultimately, Walsh's claim, if any, is not that Audoire lacked "capacity," but that she breached the contingency fee agreement leaving him uncompensated for time and services spent on her behalf, despite her ultimate recovery. See *Malonis* v. *Harrington,* 442 Mass. 692, 697 (2004) (discussing attorney's right to fair and reasonable value of services expended on theory of quantum meruit after contingent fee contract was terminated and former client ultimately recovered). That claim is not before us. Nor has Walsh asked the Superior Court to enforce any potential attorney's lien on disbursements from the settlement trust, pursuant to G. L. c. 221, § 50. See *Northeastern Avionics, Inc.* v. *Westfield,* 63 Mass. App. Ct. 509, 513 & n.4 (2005) (describing burden on attorney seeking lien enforcement, and noting that the requirements are "separate and apart from the threshold question of the attorney's contractual or quantum meruit right to recover the fees").