502                    67 Mass. App. Ct. 502 (2006)

Local 2071, International Association of Firefighters *v.* Town of Bellingham.

LOCAL 2071, INTERNATIONAL ASSOCIATION OF FIREFIGHTERS *vs.* TOWN OF BELLINGHAM & others.[1]

No. 05-P-516.

Worcester. December 15, 2005. - October 6, 2006.

Present: PERRETTA, GREENBERG, LAURENCE, KAFKER, & MILLS, JJ.[2]

Further appellate review granted, 447 Mass. 1113 (2006).

*Joint Labor-Management Committee. Labor,* Public employment, Collective bargaining, Fire fighters, Duty to bargain. *Municipal Corporations,* Fire department, Collective bargaining. *Public Employment,* Collective bargaining, Managerial prerogative. *Arbitration,* Collective bargaining, Fire fighters.

This court affirmed a judgment of the Superior Court requiring a town to implement a scheduling change for fire fighters, as proposed by the fire fighters' union and as awarded after arbitration ordered by the Joint Labor-Management Committee (JLMC), where the union's proposal (specifically, to move to twenty-four hour shifts) constituted a mandatory subject of bargaining under G. L. c. 150E, § 6, and thus fell within the jurisdiction of the JLMC [507-510]; and where it was reasonable for the JLMC to conclude, on the record before it, that the decision to move to twenty-four hour shifts was not a public safety policy decision that had to remain within management's sole prerogative [510-514]. MILLS, J., dissenting, with whom LAURENCE, J., joined.

CIVIL ACTION commenced in the Superior Court Department on June 30, 2004.

The case was heard by *Peter W. Agnes, Jr.,* J.

*Albert R. Mason* for town of Bellingham.

*Harold L. Lichten* for the plaintiff.

[1]Fire chief of Bellingham and Massachusetts Joint Labor-Management Committee (JLMC or committee).

[2]The case was initially heard by a panel comprised of Justices Laurence, Kafker, and Mills. After circulation of the opinions of the panel to the other Justices of the Appeals Court, the panel was expanded pursuant to the long-standing practice of the Appeals Court designed to ensure that published opinions reflect the view of a majority of the Justices. See *Sciaba Constr. Corp.* v. *Boston,* 35 Mass. App. Ct. 181, 181 n.2 (1993).

*Robert L. Quinan, Jr.,* Assistant Attorney General, for Massachusetts Joint Labor-Management Committee.

*Patrick N. Bryant,* for Boston Police Patrolmen's Association, Inc., amicus curiae, submitted a brief.

KAFKER, J. The town of Bellingham (town) appeals from a judgment of the Superior Court requiring the town to implement a scheduling change for fire fighters represented by the International Association of Firefighters (union). The scheduling change was awarded by the Joint Labor-Management Committee (JLMC or committee), which was established by emergency legislation to "provide an impasse procedure conducive to the peaceful resolution of collective bargaining disputes involving municipal police officers and firefighters." St. 1977, c. 730, § 1, adding § 4A to St. 1973, c. 1078 (hereinafter act or § 4A). See *Massachusetts Teachers Assn.* v. *Secretary of the Commonwealth,* 384 Mass. 209, 238 n.25 (1981) (JLMC "dominant force in resolving police and firefighter labor deadlocks by means of binding arbitration").

At issue is whether the union's proposal for twenty-four hour shifts is beyond the scope of interest arbitration authorized by the act. We conclude that the twenty-four hour shifts at issue are within the scope of arbitration under the act: shift schedules structure the hours of employment and therefore constitute a mandatory subject of bargaining under G. L. c. 150E, § 6. Moreover, as the twenty-four hour shifts proposed here do not determine who can be assigned to particular shifts or particular duties on shifts, they do not come within the act's exclusion of "assignments" from the scope of arbitration. Finally, as the record before us establishes that twenty-four hour shifts are common in comparable fire departments, and the JLMC has consistently allowed the issue of twenty-four hour shifts to be arbitrated, it was reasonable for the JLMC to conclude that the decision to move to twenty-four hour shifts was not a public safety policy decision that must remain within management's sole prerogative.

*Background.* The town provides fire fighting services twenty-four hours per day, seven days per week to protect the citizens of its community. This means that at all times there is a shift of fire fighters on duty to provide all necessary services. Article X

of the agreement between the town and the union, as in effect prior to the decision of the JLMC in this case, provided as follows:

> "Section 5. Working hours for firefighters on the platoon system schedule will average forty-two . . . hours per week, with two . . . ten[-]hour day shift tours and two . . . fourteen[-]hour night shift tours per eight[-]day cycle. Such tours shall be worked consecutively."

Thus, pursuant to article X of the agreement, a fire fighter worked the following schedule:

Day 1:    ten-hour day shift (8:00 A.M. to 6:00 P.M.)

Day 2:    ten-hour day shift (8:00 A.M. to 6:00 P.M.)

Day 3:    fourteen-hour night shift (6:00 P.M. to 8:00 A.M.)

Day 4:    fourteen-hour night shift (6:00 P.M. to 8:00 A.M.)

Days 5-8: four days off

In order to provide coverage twenty-four hours per day, seven days per week, the town had fire fighters working the schedule discussed above on a rotating basis. When someone was sick or on vacation or otherwise absent, a fire fighter would commonly volunteer to work extra shifts, thereby remaining on duty twenty-four hours straight.

In collective bargaining with the town, the union proposed a change to twenty-four hour shifts. The twenty-four hour shift proposal provided for a schedule as follows:

Day 1:    ten-hour day shift
          fourteen-hour night shift (thus a twenty-four hour shift)

Days 2-3: two days off

Day 4:    ten-hour day shift
          fourteen-hour night shift (another twenty-four hour shift)

Days 5-8: four days off

This change apparently would not affect the average number of

scheduled hours worked per eight-day cycle, nor mandate who would be assigned to which shift or to what duty on each shift.

The town consistently opposed the shift change and argued that the decision was a management prerogative. The parties were unable to reach an agreement, and the union petitioned the JLMC to exercise jurisdiction. The town objected, contending that twenty-four hour shifts were beyond the jurisdiction of the JLMC. The JLMC rejected that argument, asserted jurisdiction, and ordered the issue of twenty-four hour shifts, along with other unresolved disputes no longer at issue, to binding arbitration.

The arbitration panel, which consisted of one management representative, one labor representative, and one neutral, unanimously agreed to impose the twenty-four hour shifts discussed above. The panel did so after allowing the parties a "full opportunity to present evidence and make arguments." As set out in the union's supplemental appendix, the information before the arbitration panel included testimony taken from a number of town officials, including the town manager and the fire chief, as well as various union officials.[3] The union also presented to the panel the decisions of seventeen other JLMC arbitration panels addressing, and in almost all cases awarding, twenty-four hour shifts. These decisions considered testimony from fire chiefs and union officials recounting their experiences with or concerns about twenty-four hour shifts, surveys of a number of communities in Massachusetts and the United States that had adopted twenty-four hour shifts, various studies, and arbitrators' analyses of the effect of twenty-four hour shifts on fire fighter fatigue, sick time, morale, and training. The union also submitted an affidavit from Professor John Dunlop, who had served as the chairman of the JLMC since 1977. His affidavit included a list of thirteen cases in which a JLMC arbitrator had ordered the imposition of a twenty-four hour shift schedule for municipal fire fighters.

The panel acknowledged the town's argument that the panel did not have the authority to award twenty-four hour shifts, but concluded that "pursuant to General Laws Chapter 150E provisions, wages, *hours*, [and] working conditions . . . are manda-

---

[3]The record does not, however, include transcripts of the testimony.

tory topics of bargaining." Applying the statutory language, the panel concluded that "[w]ork shifts structure and define hours of work and are an implicit component of hours of work. . . . Consequently, it is the panel's opinion that it has the authority to issue an award of the twenty-four . . . hour shift as just another structure of the hours of work."

The panel went on to find that eleven of twelve comparable communities had implemented twenty-four hour fire fighting shifts. It also rejected the town's "primary contention" that "a twenty-four . . . hour shift would present a significant public safety risk due to Firefighter[] fatigue" because "as in all Firefighter shifts, there is 'down-time' during which Firefighters are not physically taxed. Such 'down-time' can be and is typically utilized by Firefighters to replenish their physical stamina. Moreover, Town Firefighters currently work a twenty-four . . . hour shift on a periodic basis with no identified problems."[4]

The panel also identified benefits to the twenty-four hour shift. It concluded that "the evidence supports a finding that sick leave utilization . . . should decrease . . . over time as there are half as many opportunities for sick leave utilization in a twenty-four . . . hour shift." The panel further found that "overtime costs should decrease as it is less likely that Firefighters will be held over at the end of their shifts, coinciding with busy run times[,] as is the current practice."

The arbitration panel also provided for a mediation and arbitration process in the event that either party later sought to terminate the twenty-four hour shift schedule. The process would begin with mediation, but if that were unsuccessful, an expedited arbitration would be ordered. The award further provided that, once in arbitration, "[t]he arbitrator shall terminate the twenty-four . . . hour schedule for the next fiscal year if he finds that maintaining the twenty-four . . . hour schedule is not in the best interests of the Town of Bellingham." Lastly, the award provided that, in making that determination, the arbitrator is to consider the financial costs and operational

---

[4]This last finding was apparently based on the town fire chief's own testimony.

impacts of twenty-four hour shifts and their effect on fire fighter morale and training.

The town appealed the JLMC decision to the Superior Court, which resulted in an order of dismissal and further appeal to this court. See *Bellingham* v. *Local 2071, Intl. Assn. of Fire-fighters*, 64 Mass. App. Ct. 446 (2005) (*Bellingham I*). Before our decision issued in *Bellingham I*, the union filed a complaint in the Superior Court, seeking enforcement of the arbitration panel's award. Upon the union's complaint, a permanent injunction issued enforcing the panel's award; the judgment also declared that the shift assignment issue was arbitrable and that there was support in the record for the panel's decision. The town appeals, and all issues are now before us for resolution, as both parties have requested that this court bring finality to this protracted dispute.[5]

*Discussion.* The JLMC consists of fifteen members representing both labor and management interests. The committee is empowered to order police and fire fighter collective bargaining disputes to binding arbitration to avoid job actions in these critical public safety functions. There are limits, however, to the committee's powers.

> "[T]he scope of arbitration in police matters shall be limited to wages, hours, and conditions of employment and shall not include the following matters of inherent managerial policy: the right to appoint, promote, assign, and transfer employees; and . . . the scope of arbitration in firefighter matters shall not include the right to appoint and promote employees. Assignments shall not be within the scope of arbitration; provided, however, that the subject matters of initial station assignment upon appointment or promotion shall be within the scope of arbitration. . . . Notwithstanding any other provisions of this act to the contrary, no municipal employer shall be required to negotiate over subjects of minimum manning of shift coverage, with an employee organization representing municipal police officers and firefighters. Nothing in this section shall be construed to include within the scope of

---

[5]We acknowledge the amicus brief filed by the Boston Police Patrolmen's Association, Inc.

508                       67 Mass. App. Ct. 502 (2006)

Local 2071, International Association of Firefighters *v.* Town of Bellingham.

arbitration any matters not otherwise subject to collective bargaining under the provisions of [G. L. c. 150E]."

St. 1973, c. 1078, § 4A(3)(*a*), as amended through St. 1987, c. 589, § 1.

General Laws c. 150E, § 6, inserted by St. 1973, c. 1078, § 2, provides in pertinent part:

> "The employer and the exclusive representative . . . shall negotiate in good faith with respect to wages, hours, standards or productivity and performance, and any other terms and conditions of employment . . . ."

The first issue to be decided is whether the reference in G. L. c. 150E, § 6, to "wages, hours, . . . and any other terms and conditions of employment" includes shift hours. As the arbitration panel correctly concluded, shifts structure hours of employment and fit neatly within the plain meaning of "hours" in G. L. c. 150E, § 6. See *Local 589, Amalgamated Transit Union* v. *Massachusetts Bay Transp. Authy.*, 392 Mass. 407, 415 (1984), quoting from G. L. c. 4, § 6 ("unless a statutory term is 'technical,' 'words and phrases shall be construed according to the[ir] common and approved usage' "). Although the particular shift proposal may be excluded from bargaining for other reasons, the hours of shifts are ordinarily a mandatory subject of bargaining and therefore within the scope of the arbitration provision. See, e.g., *Labor Relations Commn.* v. *Natick*, 369 Mass. 431, 436 (1976) ("tours[,] . . . shifts of duty, [and] work schedules" are proper subjects of bargaining); *Boston & Boston Police Superior Officers Fedn.*, 10 M.L.C. 1189, 1193 (1983) ("The general topic of hours of work, including the hours of work each day and organization of such hours into shifts or tours of duty, is a mandatory subject of bargaining"). See also *Fire Fighters Union, Local 1186, Intl. Assn. of Fire Fighters, AFL-CIO* v. *Vallejo*, 12 Cal. 3d 608, 617 (1974) (schedule of hours of fire fighters on twenty-four hour shifts "clearly negotiable and arbitrable"); *Teaneck* v. *Teaneck Firemen's Mut. Benevolent Assn. Local No. 42*, 353 N.J. Super. 289, 305 (2002), aff'd, 177 N.J. 560 (2003) (proposed twenty-four hour shift subject to interest arbitration). See generally *Chief Justice for*

*Admn. & Mgmt. of the Trial Ct.* v. *Office & Professional Employees Intl. Union, Local 6, AFL-CIO*, 441 Mass. 620, 630 (2004), quoting from *School Comm. of Pittsfield* v. *United Educators of Pittsfield*, 438 Mass. 753, 761-762 (2003) (emphasizing Commonwealth's "strong public policy favoring collective bargaining").

Statute 1973, c. 1078, § 4A, also expressly excludes certain matters from arbitration. In regard to shifts, the act expressly excludes only "minimum manning" provisions. It does not, in contrast, exclude shift hours. The act also excludes fire fighter assignments.[6] The town contends that the exclusion of assignments encompasses shifts. The arbitration panel concluded otherwise, and we agree.[7] The shift proposal here does not determine who is assigned to which shift. Rather, it is limited to the hours of the shift. It also does not determine who is assigned to do what on the shift. See *Massachusetts Bay Transp. Authy.* v. *Local 589, Amalgamated Transit Union*, 406 Mass. 36, 40 (1989), quoting from Webster's Third New Int'l

---

[6]The assignment exclusion in § 4A does not apply to "the subject matters of initial station assignment upon appointment or promotion."

[7]We also note the JLMC's special role in interpreting the restrictions in § 4A pertaining to fire fighter assignments: before 1980, restrictions on arbitrability as to fire fighters were to be found in St. 1973, c. 1078, § 4, as amended by St. 1977, c. 347, § 2. Upon the repeal of § 4, see St. 1980, c. 580, § 10, its provisions were imported into § 4A. However, during the period when § 4 was still extant, the JLMC was directed to "interpret" and "administer" the language of § 4 with respect to limitations on the arbitrability of fire fighter assignments. See St. 1977, c. 730, § 1, which inserted § 4A:

"[T]he committee shall:

"(1) specify the issue or issues to be arbitrated; provided, however, that the committee shall not specify for arbitration any issue excluded from arbitration pursuant to section four of this act. *The committee may, however, interpret the language of said section four as it deals with firefighter assignments* and transfers" (emphasis supplied).

See also St. 1979, c. 154, § 1, which amended § 4A:

"[T]he committee shall:

"(1) specify the issue or issues to be arbitrated; provided, however, that the committee shall not specify for arbitration any issue excluded from arbitration pursuant to section four, and *the committee may, however, administer the provisions of said section four relative to firefighter assignments* and transfers" (emphasis supplied).

Dictionary 132 (1961) ("[t]o 'assign' ordinarily means 'to appoint to a post or duty' "). Nothing in the shift proposal before us appears to limit the fire chief's ability to make sure that the right people are in the right positions on the right shift. Contrast *Taunton* v. *Taunton Branch of the Mass. Police Assn.*, 10 Mass. App. Ct. 237, 243-244 (1980) (provisions depriving police chief of authority over "number, qualifications and identity of officers" on shifts not properly subject to arbitration).[8]

The last exclusion in § 4A is the most difficult to delineate: "Nothing in this section shall be construed to include within the scope of arbitration any matters not otherwise subject to collective bargaining under the provisions of [G. L. c. 150E]." As the Supreme Judicial Court has explained, "from [the] expansively defined category of mandatory bargaining subjects, we have exempted certain types of managerial decisions that must, as a matter of policy, be reserved to the public employer's discretion." *Worcester* v. *Labor Relations Commn.*, 438 Mass. 177, 180 (2002) (*Worcester*). A union cannot, for example, determine the level of government services. See, e.g., *School Comm. of Newton* v. *Labor Relations Commn.*, 388 Mass. 557, 563 (1983). In the instant case, however, the town had previously established coverage twenty-four hours per day, seven days per week. The union was not therefore demanding that the employer provide additional fire fighting services or personnel. Rather, the union sought to negotiate how the existing employees would divide up the coverage that the employer had chosen to provide.

The town, without elaboration or reference to any evidence in the record, contends that the quality of the fire fighter services will be affected by the move to twenty-four hour shifts. Essentially, the town appears to be arguing that fire fighters will become tired as they work a twenty-four hour shift and therefore will be less effective in performing their critical public safety duties. As a result, the town argues, the decision to establish

---

[8]The dissent suggests that the move to twenty-four hour shifts will impinge on the fire chief's ability to assign fire fighters to a particular shift or even a particular duty. The town did not make this argument. Nor is there anything in the record that indicates that the move to twenty-four hour shifts will have any impact on assignments.

twenty-four hour shifts "must be reserved to the sole discretion of the public employer so as to preserve the intended role of the governmental agency and its accountability in the political process." *Worcester*, 438 Mass. at 181, quoting from *Lynn* v. *Labor Relations Commn.*, 43 Mass. App. Ct. 172, 178 (1997).

The arbitration panel addressed the substance of this concern. It relied on submissions by the union that established that eleven of twelve comparable communities have implemented twenty-four hour shifts, testimony that Bellingham fire fighters currently work a twenty-four hour shift "on a periodic basis with no identified problems," and its own understanding that on "all Firefighter shifts, there is 'down-time' during which Firefighters are not physically taxed[,] . . . [which] is typically utilized by Firefighters to replenish their physical stamina."[9] In the record before the panel, there was also information indicating that twenty-four hour shifts are common throughout the United States, and that other arbitrators addressing twenty-four hour shifts have not been persuaded that concerns about fire fighter fatigue arising from such shifts were well founded.[10]

The town contends nonetheless that as matter of law, the decision to allow twenty-four hour shifts must remain a management prerogative for the town to fulfil its public safety responsibilities. It relies on the Supreme Judicial Court's decision in *Worcester*, 438 Mass. at 183 ("A public employer need not defend the wisdom of a policy choice that it has made in order to have that choice recognized as a core managerial prerogative. It is the fact that the public employer's choice is one of policy, not the merits of the choice the employer makes, that renders the choice an inappropriate subject of mandatory bargaining").

Unlike the instant case, *Worcester* involved a core governmen-

---

[9]Although the panel's decision on the merits, which was adopted by the committee, must be supported by "material and substantive evidence," § 4A(3)(*a*), we are unable to review the panel's findings because the town has not provided us with a complete administrative record. See Mass.R.A.P. 18(a), as amended, 425 Mass. 1602 (1998). Thus, any evidentiary challenge based on § 4A(3)(*a*), to the extent that the town makes one, is waived.

[10]We note that the prior shift schedule involved switching from day to night shifts within the same week, which might also be argued to cause fire fighter fatigue.

tal function — establishing the priorities of law enforcement, see *id.* at 182 — "far removed" from the wage and hour issues at the core of collective bargaining. See Greenbaum, The Scope of Mandatory Bargaining Under Massachusetts Public Sector Labor Relations Law, 72 Mass. L. Rev. 102, 108 (1987) (in deciding whether an issue is a mandatory subject of bargaining or a policy decision reserved to the government employer, Labor Relations Commission [commission] considers "the impact of the issue on terms and conditions of employment; . . . whether it involves a core governmental decision; and . . . whether it is far removed from terms and conditions of employment"). Here, in contrast, we are addressing an issue at the core of collective bargaining: work hours. The only public policy concern articulated by the town — fire fighter fatigue — was also found to be without basis due to the downtime on "all" fire fighter shifts, which allows fire fighters to "replenish their physical stamina."

In identifying management prerogatives outside the scope of bargaining, the Supreme Judicial Court has generally emphasized that the negotiating requirement must "unduly impinge on a public employer's freedom to perform its public functions." *Worcester,* 438 Mass. at 180, quoting from *Local 346, Intl. Bhd. of Police Officers* v. *Labor Relations Commn.,* 391 Mass. 429, 437 (1984). It has also stated that "the ingredient of public policy" must be "comparatively heavy." *School Comm. of Boston* v. *Boston Teachers Union, Local 66, Am. Fedn. of Teachers (AFL-CIO),* 378 Mass. 65, 71 (1979). Additionally, "[t]he list of factors so fundamental to the effective operation of an enterprise as to be exempt from mandatory bargaining requirements will of necessity vary with the nature of the employer." *Worcester,* 438 Mass. at 181, quoting from *Local 346, Intl. Bhd. of Police Officers* v. *Labor Relations Commn., supra* at 439-440.

With this guidance, and with the benefit of the various arbitration panels' analyses of the practical realities of twenty-four hour shifts included in the record, we are ultimately persuaded that the proposal is arbitrable. To reserve to the sole discretion of management a core subject of collective bargaining (shift hours) on public safety policy grounds requires a clearer showing that public safety is being affected by the scheduling proposal.

In reaching this conclusion, we recognize that "the question whether the [JLMC] acted in excess of the authority conferred on [it] . . . is always open for judicial review." *Higher Educ. Coordinating Council/Roxbury Community College* v. *Massachusetts Teachers' Assn./Mass. Community College Council*, 423 Mass. 23, 27 (1996), quoting from *School Comm. of Holbrook* v. *Holbrook Educ. Assn.*, 395 Mass. 651, 654 (1985). Nonetheless, some deference is owed to the JLMC's consistent interpretation of its own statute on the question whether twenty-four hour shifts are within "the scope of arbitration" pursuant to § 4A. See *Massachusetts Org. of State Engrs. & Scientists* v. *Labor Relations Commn.*, 389 Mass. 920, 924 (1983) ("ordinary precepts of statutory construction instruct us to accord deference to an administrative interpretation of a statute"); *Board of Educ.* v. *School Comm. of Quincy*, 415 Mass. 240, 243 (1993) ("reasonable and consistent interpretations of statutes, by agencies charged with their implementation, are entitled to deference"). The fifteen-member JLMC, see St. 2002, c. 300, § 14, reflects both labor and management perspectives and consists of people with experience and expertise in police and fire fighter matters. Compare *Worcester*, 438 Mass. at 180 (we "must accord deference to the commission's specialized knowledge and expertise, and to its interpretation of the applicable statutory provisions"). The members of the JLMC are well-prepared to address the question of what constitutes a mandatory subject of bargaining and the practical consequences of a twenty-four hour shift, including fire fighter fatigue. On thirteen prior occasions, after the JLMC ordered arbitration on twenty-four hour shifts, the arbitration panels, after substantial consideration of the merits, awarded twenty-four hour shifts at least on a trial basis.[11]

*Conclusion.* The decision by the arbitration panel here reasonably applied the language of § 4A conferring jurisdiction, concluding that shifts structure hours, and that hours are a mandatory subject of bargaining. The panel also rejected the fire fighter fatigue argument. The panel's decision was consistent with the approach and analysis of other arbitration

---

[11]The instant award also preserved reconsideration of the issue if either side later sought to terminate the twenty-four hour shift schedule.

panels considering the issue. The collective decision-making of the JLMC and its designated arbitration panels contains, in our view, a far more careful and informed consideration of the issue than the dissent acknowledges.[12] Finally, the approach adopted by the JLMC has accomplished an important statutory purpose: to prevent turbulent, unsettled collective bargaining relations on difficult issues from potentially interfering with the provision of critical public safety services. For these reasons, we affirm the judgment.[13]

*So ordered.*

MILLS, J. (dissenting, with whom Laurence, J., joins). I would hold that the record does not contain sufficient facts[1,2] or reasoned analysis to resolve the question whether the proposed

---

[12]We are also puzzled by what the dissent hopes to accomplish with a remand. The materials in the union's supplemental appendix, along with the provisions of § 4A, the arbitration award, and the excerpts regarding shift hours from the prior collective bargaining agreement, are more than sufficient to address the issue of arbitrability itself, which is a question of statutory or contractual interpretation to be made by the court. See *Old Rochester Regional Teacher's Club* v. *Old Rochester Regional Sch. Dist. Comm.*, 398 Mass. 695, 698-700 (1986); *Local Union No. 1710, Intl. Assn. of Fire Fighters, AFL-CIO* v. *Chicopee*, 430 Mass. 417, 419-421 (1999). Compare *Massachusetts Hy. Dept.* v. *Perini Corp.*, 444 Mass. 366, 374-376 (2005). It is difficult to imagine what additional information would be generated on remand that would help resolve the legal question whether a twenty-four hour shift is more properly considered a mandatory subject of bargaining regarding work hours or a public policy prerogative of management.

[13]Given the result we have reached, the remand ordered in *Bellingham I* is no longer necessary. Our disposition in *Bellingham I* is vacated, not on the merits, but because that appeal has become moot.

[1]Under the schedule in effect (existing schedule) prior to the decision of the Joint Labor-Management Committee (JLMC or committee), each fire fighter worked approximately sixteen days per month. In each eight-day period, a given fire fighter worked a ten-hour daytime shift on day one, a ten-hour daytime shift on day two, a fourteen-hour nighttime shift on day three, and a fourteen-hour nighttime shift on day four. On days five through eight, the fire fighter was off duty.

Under the change proposed by Local 2071, International Association of Firefighters (union), awarded by the JLMC arbitration panel, and enforced by the Superior Court, fire fighters are scheduled as follows: one full day (twenty-four hours) on duty, followed by two full days off, followed by one full day on duty, followed by four full days off. Although the number of hours worked

scheduling change is a mandatory item for collective bargaining

in each eight-day period remains unchanged, the number of working days per month was reduced from about sixteen to approximately eight.

The union and committee consistently refer to the union's proposed scheduling change only in the context of hours (e.g., "twenty-four hour shift"). I consider this misleading. If the scheduling alterations are to be correctly described, they must be characterized as including a rigid redistribution of the working days within a given eight-day period and an adjustment to the number of days worked per month (here, a reduction from about sixteen days to about eight days). Management flexibility in specific workday assignments is virtually eliminated.

[2]The record descriptions of the existing schedule are, at times, inexact and ambiguous. An affidavit of the union's attorney, attached as exhibit B to the union's complaint, reports a "schedule of one 10-hour day, followed by a 10-hour day, followed by a 14-hour night shift, another 14-hour night shift, and several days off." Whether or not the second ten-hour day shift and the first fourteen-hour night shift may be served back-to-back, aggregated as a single twenty-four hour shift, is not made explicit. This confusion is exacerbated by the union's supplemental brief, in which it represents the existing schedule as:

> "a 10-hour day shift (8:00 A.M. to 6:00 P.M.) followed by a 10-hour day shift the next day (8:00 A.M. to 6:00 P.M.), followed by a 14-hour night shift the next day (6:00 P.M. to 8:00 A.M.), followed by a 14-hour night shift the next day (6:00 P.M. to 8:00 A.M.), followed by four days off."

Assuming the conventional seven-day cycle, the above description suggests a three-day work week. Accommodating the four required shifts within three days would necessitate merging the second ten-hour daytime shift and the first fourteen-hour nighttime shift into a single twenty-four hour shift.

In actuality, however, the agreement between the town of Bellingham (town) and the union requires "two . . . ten[-]hour day shift tours and two . . . fourteen[-]hour night shift tours per eight[-]day cycle." The union not only neglects to explain that the scheduling cycle actually consists of eight days, but erroneously asserts a seven-day cycle. Its supplemental brief references a "7-day cycle" in one place and a "weekly cycle" in another. The difference is significant. An eight-day cycle that includes four days off yields a four-day work week, which in turn suggests that each of the four required shifts was to be scheduled for a different day. Thus, for example, if the schedule started on a Monday, an eight-day cycle would be as follows:

| | |
|---|---|
| Monday: | ten-hour day shift (8:00 A.M. to 6:00 P.M.) |
| Tuesday: | ten-hour day shift (8:00 A.M. to 6:00 P.M.) |
| Wednesday: | fourteen-hour night shift (6:00 P.M. to 8:00 A.M.) (thus, a twenty-four hour *break* between the end of the Tuesday shift and the beginning of the Wednesday shift) |
| Thursday: | fourteen-hour night shift (6:00 P.M. to 8:00 A.M.) |
| Friday-Monday: | four days off |

under G. L. c. 150E, a jurisdictional requirement for the Joint Labor-Management Committee (JLMC or committee) arbitration panel's award of the scheduling change. While vacation of the Superior Court judgment enforcing the award would be appropriate on this record, in deference to the committee I would remand to permit further factual and legal analysis to support the committee's exercise of jurisdiction, without suggesting that such an attempt would be successful.

*Background.* In negotiations with the town of Bellingham (town) for a successor collective bargaining agreement,[3] the International Association of Firefighters (union) specified several items for bargaining.[4] These included the scheduling issue, which the town rejected, asserting that the matter was not mandatory for bargaining under G. L. c. 150E. The JLMC assumed impasse jurisdiction pursuant to St. 1973, c. 1078, § 4A, as amended through St. 1987, c. 589, § 1 (hereinafter the act or § 4A), and implicitly rejected the town's jurisdictional objection[5] by submitting all items to binding arbitration before

The JLMC comes the closest to presenting the existing schedule withadequate precision. Its brief characterizes the existing shift distribution as following the pattern:

"10 . . . -X[]-10-X[]-14-X[]-14-X[]" where "10" and "14" represent shift hours worked and " 'X' . . . stand[s] for particular blocs of time in which a given firefighter is not working."

[3]The requirement and right to bargain, for fire fighters and other municipal employees, derives from G. L. c. 150E, which requires negotiations "in good faith with respect to wages, hours, standards or productivity and performance, and any other terms and conditions of employment . . . ." G. L. c. 150E, § 6, inserted by St. 1973, c. 1078, § 2.

[4]None of the contract items, aside from the scheduling issue, is part of this appeal.

[5]These proceedings began with the town's response to the union's initial specification of the items to be bargained and have since come to include appearances before the committee, the arbitration panel appointed by the committee, Superior Court, and, now, this court. The town has raised a consistent set of objections at each of these stages. It has relentlessly maintained that the committee's award was ultra vires because (1) the scheduling issue is a matter of management prerogative and not a mandatory subject for bargaining under G. L. c. 150E; and (2) § 4A, when read in conjunction with the decisions of the appellate courts and the Massachusetts Labor Relations Commission (LRC), does not permit the JLMC to assume jurisdiction over the scheduling issue.

a three-member panel.[6] The panel acknowledged the town's jurisdictional argument, but concluded that

> "pursuant to [G. L. c.] 150E . . . , hours . . . are [a] mandatory topic[] of bargaining . . . . Work shifts structure and define hours of work and are an implicit component of hours of work. Employees are typically scheduled to work a specific number of hours within a delineated period of time such as a day, a week, or a month. However, the hours worked in such a period of time are organized into units typically referred to as shifts. Consequently, it is the panel's opinion that it has the authority to issue an award of the twenty-four . . . hour shift as *just another structure of the hours of work*" (emphasis added).

In its decision, the arbitration panel noted that eleven of twelve "universe communities"[7] have implemented the so-called twenty-four hour shift,[8] and that evidence supports a finding that sick leave and overtime pay would decrease as a consequence of the scheduling change. The panel noted, and rejected, the town's concern that the change would present a public safety risk due to fire fighters' fatigue, reasoning that "in all Firefighter shifts, there is 'down-time' during which Firefighters are not physically taxed [and that] [s]uch 'down-time'

[6]There is no record of the arguments or evidence, if any, placed before the JLMC on the jurisdictional issue. Similarly, there is no record of the action taken by the committee on this matter, other than the implicit positive ruling by reference of all items, including the scheduling issue, to the arbitration panel. I have been unable to identify any document, opinion, or award of the committee analyzing the twenty-four hour scheduling issue and its impact upon management responsibilities.

[7]The arbitration panel described "universe municipalities" as communities located in the geographic vicinity of the town.

[8]There is no indication in the decision of the arbitration panel of how the scheduling change occurred in the other communities (for example, by agreement, award, or otherwise), and whether jurisdiction had been contested, let alone addressed. For most issues, the fact that a given topic is not mandatory for bargaining does not forbid the parties from bargaining over the issue voluntarily. See *Town of Danvers & Local 2038, IAFF*, 3 M.L.C. 1559, 1563 (1977). Compare *School Comm. of Hanover* v. *Curry*, 369 Mass. 683, 685 (1976) (some powers, vested completely and exclusively in the municipal authority, are categorically barred from delegation to an arbitrator); *School Comm. of Braintree* v. *Raymond*, 369 Mass. 686, 689 (1976).

can be and is typically utilized by Firefighters to replenish their physical stamina." Finally, the panel noted that the town's fire fighters currently work twenty-four continuous hours on a periodic basis with no identified problems.

The union commenced this equity action in Superior Court seeking injunctive relief to enforce the arbitration panel's award.[9] The town reasserted its jurisdictional argument. After a judge granted preliminary relief, the town filed a "Motion to Be Heard and for a Ruling on the Arbitrability Issue or the Validity of the Twenty Four Hours Provision of the Arbitration Award in Question." A different Superior Court judge denied the motion to be heard but then, treating it as a motion for summary judgment, ruled that the scheduling issue is arbitrable, which is, of course, the equivalent of making a positive ruling as to the committee's jurisdiction.[10]

In my view, a positive decision was not appropriate at this stage of the proceedings. Because the town raised a nonfrivolous objection to the jurisdiction of the committee, it became incumbent upon the committee, in this case, (1) to receive evidence purporting to prove or disprove its jurisdiction and (2) to weigh this evidence in a transparent manner and then issue a documented decision allowing for review in the courts.[11] The union makes some suggestion that the committee may have

[9]Section 4A(3)(a) provides that enforcement may be obtained through an equity action in the Superior Court brought by either party or the committee.

[10]The judge also ruled that there is support in the record for the arbitration panel's decision; that the panel's award is not the equivalent of an "assignment" of fire fighters (explicitly nonarbitrable under the act); and that the shift issue is not subject to any other exemption under the act.

[11]This case highlights an acute challenge for the JLMC. On the one hand, the Legislature instructs the committee to promptly and completely resolve disputes that involve a threat to the continued provision of public safety services. To that end, the committee is given "exclusive jurisdiction in matters over which it assumes jurisdiction." § 4A(3)(a). On the other hand, however, the Legislature creates two significant exceptions to that jurisdiction (see discussion in parts [a] and [b], infra) and neither is, in practice, straightforward to apply. Further complicating matters is the concept that

"[i]f a particular subject is within the mandatory scope of bargaining, either party commits an unfair labor practice when it refuses a demand to negotiate. The parties may bargain on permissive subjects, but neither the employer nor the exclusive representative may insist to the point of

heard such evidence, but the record contains no description of it, and in any event, it appears that the committee only impliedly disposed of the town's objection, without explanation. See note 17, *infra*.[12]

*Discussion.* This case turns on whether the scheduling issue is, as urged by the union and the committee, mandatory for bargaining, as the simple arrangement of hours in a day, or, as urged by the town, a matter of management prerogative not mandatory for bargaining under G. L. c. 150E and, hence, explicitly exempted from the committee's jurisdiction under the act.

(a) *The committee's impasse jurisdiction.* Statute 1977,

---

impasse on negotiations over such topics."

*Town of Danvers & Local 2038, IAFF*, 3 M.L.C. at 1563.

I would leave it to the committee, in the first instance, to determine the appropriate protocol for effectuating its statutory mandates and observing its statutory restrictions. It appears to me that nonfrivolous objections to the committee's jurisdiction require an expeditious and adequately documented mode of resolution prior to (and, as much as possible, in lieu of) litigation. The committee itself should have the first opportunity to devise such a protocol.

Of particular difficulty, perhaps, would be the determination of where the burden of proof is properly placed when a party asserts a challenge to the subject matter jurisdiction of the committee. Consistent with the above, I would leave the resolution of this question, at the committee level, to the committee itself. I do note, however, that typically it is the burden of the party asserting jurisdiction before a court to prove such jurisdiction. See *Williams* v. *Episcopal Diocese of Mass.*, 436 Mass. 574, 577 n.2 (2002); *Wooten* v. *Crayton*, 66 Mass. App. Ct. 187, 190 n.6 (2006).

Which party should assume the burden of proving or disproving the committee's initial assessment of its own subject matter jurisdiction when that issue comes before the courts would appear to be a question of first impression in the Commonwealth. Substantial case law, cited above, can be read to support the proposition that the party asserting the committee's jurisdiction must bear the evidentiary burden. This conclusion, however, seems to contradict the strong line of cases that require, as a general precept, judicial deference to the decisions of administrative agencies. These cases would, of course, weigh in favor of requiring the party challenging the committee's decision on jurisdiction to shoulder the burden of proving that the committee's jurisdiction, in fact, should or should not have attached. See *Almeida Bus Lines* v. *Department of Pub. Util.*, 348 Mass. 331, 342 (1965); *Bagley* v. *Contributory Retirement Appeal Bd.*, 397 Mass. 255, 258 (1986); *Quincy City Hosp.* v. *Labor Relations Commn.*, 400 Mass. 745, 749-750 (1987).

[12]For reasons that will be further discussed, the union's citation to other awards of the committee, or Superior Court decisions, do not provide a basis, factual or legal, to support the committee's jurisdiction.

c. 730, § 1, created the committee by adding § 4A to St. 1973, c. 1078. The act has since been amended, the last material change, for present purposes, having been made by St. 1987, c. 589, § 1. "Section 4A established [the committee] with responsibility for collective bargaining negotiations involving municipal police officers and firefighters. That committee may order disputes to be submitted to binding arbitration 'in accordance with the standards, provisions and *limitations*' of § 4 [now § 4A] of St. 1973, c. 1078" (emphasis added). *Massachusetts Teachers Assn.* v. *Secretary of the Commonwealth*, 384 Mass. 209, 236 (1981). See *Taunton* v. *Taunton Branch of the Mass. Police Assn.*, 10 Mass. App. Ct. 237, 241 (1980).

Pursuant to this oversight authority, which both overlays and partially supersedes G. L. c. 150E, the committee may assume jurisdiction, which shall be exclusive when assumed, if "there is an apparent exhaustion of the processes of collective bargaining which constitutes a potential threat to public welfare." § 4A(3)(*a*). The act provides that decisions "resulting from the mechanism or procedures determined by the committee if supported by material and substantive evidence on the whole record shall be . . . binding." *Ibid.* There are, however, two exceptions to the committee's jurisdiction: (1) "[a]ssignments shall not be within the scope of arbitration"; and (2) "[n]othing in [§ 4A] shall be construed to include within the scope of arbitration any matters not otherwise subject to collective bargaining under the provisions of [G. L. c. 150E]" (the c. 150E exemption). *Ibid.* These are jurisdictional conditions, and the committee "has only the powers and duties expressly or impliedly conferred on it by statute." *Matter of Elec. Mut. Liab. Ins. Co. (No. 1)*, 426 Mass. 362, 366 (1998), citing *Morey* v. *Martha's Vineyard Commn.*, 409 Mass. 813, 818 (1991). See *Globe Newspaper Co.* v. *Beacon Hill Architectural Commn.*, 421 Mass. 570, 586 (1996).

(b) *The G. L. c. 150E exemption.* "Pursuant to G. L. c. 150E, § 6, public employers must 'negotiate in good faith with respect to wages, hours, standards or productivity and performance, and any other terms and conditions of employment.' " *Worcester* v. *Labor Relations Commn.*, 438 Mass. 177, 180 (2002) (*Worcester*). From that expansive language, the Supreme Judicial Court has

exempted certain types of managerial decisions that must, as a matter of policy, be reserved to the public employer's discretion.[13] "[I]n instances where a negotiation requirement would unduly impinge on a public employer's freedom to perform its public functions, G. L. c. 150E, § 6, does not mandate bargaining over a decision directly affecting the employment relationship." *Worcester, supra* at 180, quoting from *Local 346, Intl. Bhd. of Police Officers* v. *Labor Relations Commn.,* 391 Mass. 429, 437 (1984). "[T]he inquiry has been directed towards defining the boundary between subjects that by statute, by tradition, or by common sense must be reserved to the sole discretion of the public employer so as to preserve the intended role of the governmental agency and its accountability in the political process." *Worcester,* 438 Mass. at 181, quoting from *Lynn* v. *Labor Relations Commn.,* 43 Mass. App. Ct. 172, 178 (1997). "[T]he crucial factor in determining whether a given issue is a mandatory subject of bargaining is whether resolution of the issue at the bargaining table is deemed to conflict with perceived requirements of public policy," *Worcester,* 438 Mass. at 181, quoting from Greenbaum, The Scope of Mandatory Bargaining Under Massachusetts Public

---

[13]The majority cites a number of cases to suggest that the consolidation of shifts into twenty-four hour blocks is not such a matter. Of the named cases, I address only the two which are authority in this court.

*Labor Relations Commn.* v. *Natick,* 369 Mass. 431, 436 (1976), does involve the forced arbitration of the "rules and regulations of [a] fire chief concerning 'tours and shifts of duty, work schedules and other patterns relating to the assignment of personnel.' " The issue for the court, however, was not the substance of what was being arbitrated but rather who was entitled to participate in the arbitration process. See *id.* at 438. Indeed, the court was careful to point out that "[n]o question is presented here whether there are certain matters still within the exclusive control of the police and fire chiefs because they are subjects . . . beyond the scope of negotiations under the collective bargaining statute." *Id.* at 438 n.5. The court, in a separate case decided one month later, ruled that there are some matters that must remain strictly within management's control and that, accordingly, are never eligible for arbitration. See *School Comm. of Hanover* v. *Curry,* 369 Mass. at 685.

Another case, *Chief Justice for Admn. & Mgmt. of the Trial Ct.* v. *Office & Professional Employees Intl. Union, Local 6, AFL-CIO,* 441 Mass. 620, 630 (2004), quoting from *School Comm. of Pittsfield* v. *United Educators of Pittsfield,* 438 Mass. 753, 761-762 (2003), is cited for the proposition that there exists a "strong public policy favoring collective bargaining." While I do not dispute this principle, I do feel that invoking this authority begs the question since we are presently considering whether the committee was barred *by statute* from accepting impasse jurisdiction over the scheduling issue.

Sector Labor Relations Law, 72 Mass. L. Rev. 102, 103 (1987), and "[a]ny attempt to define with precision and certainty the subjects about which bargaining is mandated by [G. L. c.] 150E is doomed to failure." *Lynn* v. *Labor Relations Commn.*, 43 Mass. App. Ct. at 177, quoting from Greenbaum, *supra* at 102.

The *Worcester* decision cites to cases in which Massachusetts courts have considered whether collective bargaining is mandatory for a given issue or merely permitted, in which case the matter would remain strictly within the penumbra of management rights. *Worcester*, 438 Mass. at 180-181, 185. "The list of factors so fundamental to the effective operation of an enterprise as to be exempt from mandatory bargaining requirements will of necessity vary with the nature of the employer," *id.* at 181, quoting from *Local 346, Intl. Bhd. of Police Officers* v. *Labor Relations Commn.*, 391 Mass. at 438, "and the inquiry as to whether a particular decision falls within that sphere of core managerial prerogatives must therefore be made on a case-by-case basis." *Worcester*, 438 Mass. at 181.

These appellate decisions provide principles that guide, but do not direct, the analysis and result in this case. The decisions instruct that the town is responsible for deploying public resources, personnel, and equipment, in part for the purpose of protecting citizens and property against the dangers of fire. The town is also charged with ensuring that managerial oversight is exercised so that these ends can be accomplished effectively, efficiently, and within budget. The town must remain accountable to the public, while negotiating fairly on matters that do not conflict with requirements of public policy. The decision whether an issue is within management prerogative must be made on a case-by-case basis.[14]

Both the town and the union also rely upon decisions of the Massachusetts Labor Relations Commission (LRC), the agency

---

[14]The majority repeatedly expresses doubt that the scheduling issue is a "public safety policy decision" that is properly within management's sole prerogative. However, Massachusetts case law does not require that the asserted issue of management prerogative be a public safety policy issue. Allowing citizens to retain some element of control over municipal services by preserving elected officials' political accountability for managerial decisions is, for example, an interest that for present purposes is no less legitimate than that of public safety. See *Worcester*, 438 Mass. at 181.

67 Mass. App. Ct. 502 (2006)    523

Local 2071, International Association of Firefighters v. Town of Bellingham.

most familiar with, and entrusted to administer, G. L. c. 150E. The twenty-four hour scheduling issue (so-called) has not been addressed by the LRC, and in my view, its decisions do not direct a result. The LRC decisions suggest that core management decisions that only marginally impact terms and conditions of employment are not subject to mandatory bargaining, see *Board of Trustees/Univ. of Mass. & Intl. Union, United Auto., Aerospace & Agricultural Implement Wkrs. of America*, 20 M.L.C. 1453, 1467 (1994), citing *Town of Danvers & Local 2038, IAFF*, 3 M.L.C. 1559 (1977); *Town of Dracut & Dracut Fire Fighters, Local 2586, IAFF*, 23 M.L.C. 113, 114 (1996) (*Dracut*), while issues that have a direct and significant impact on employees' safety are subject to mandatory bargaining. See *Town of Shrewsbury & Local 426, Intl. Bhd. of Police Officers*, 14 M.L.C. 1309, 1311 (1987) (*Shrewsbury*); *Town of Halifax & IAFF, Local 3159*, 20 M.L.C. 1320, 1323 (1993) (*Halifax*); *Dracut, supra*. The particular safety concern may appear simple, such as the request to wear a seatbelt, *Shrewsbury, supra*, or more complex, such as the number of fire fighters assigned to a particular responding vehicle. See *Halifax*, 20 M.L.C. at 1324; *Dracut*, 23 M.L.C. at 114. The LRC has noted that "[d]etermining what constitutes a mandatory subject [for bargaining] in fire department staffing and response cases proves particularly vexatious," *Halifax, supra* at 1323, and has traditionally balanced the union's interest in bargaining safety and workload issues with the employer's interest in making managerial decisions about the level of service to provide. *Ibid.*[15]

(c) *The absence of jurisdictional facts.* The town's consistent resistance to arbitration of the scheduling issue and its objection

---

[15]In *Halifax, supra* at 1323-1324, the LRC reviewed a number of its own cases and stated:

"To determine whether an employer made any changes that affected a mandatory subject of bargaining, the Commission has historically balanced the union's interest in bargaining over safety and workload issues with the employer's interest in making the core management decision of what level of services to provide. . . . A topic does not become a mandatory subject of bargaining merely because an employer's actions marginally or indirectly implicate safety or workload issues."

to the assumption of jurisdiction by the committee were not fact-based but instead presented as self-evident propositions of law. The town's brief to this court makes extensive citation to decisions of the LRC and appellate courts, but engages in almost no discernible factual analysis. The arbitration panel, as we have noted above, recited factors unrelated to the jurisdictional issue, concluding that "[e]mployees are typically scheduled to work a specific number of hours within a delineated period of time such as a day, a week, or a month," and that how these hours are arrived at is *"just another structure of the hours of work"* (emphasis added).

The union, again characterizing the scheduling issue as one strictly of hours within a day, does nothing more than nakedly assert that hours are an explicit subject for mandatory bargaining, and that the twenty-four hour shift *"simply* rearranges the work hours" (emphasis added). The union criticizes the town's cited authority as inapplicable, and itself cites to several decisions of the LRC, three decisions of the Superior Court, and awards by the committee of the twenty-four hour shift schedule "on at least 13 occasions without successful appeal by a municipality." In its brief, the union asserts that the panel took extensive documentary and testimonial evidence from witnesses. There is no such evidence in the record, however, and its absence precludes reasonable analysis and decision on the jurisdictional issue.[16]

In its brief on appeal, the JLMC, on the question of jurisdic-

[16]I disagree with the majority as to the existence in the record of sufficient facts to resolve the jurisdictional question.

In the majority's view, there are sufficient facts in the record to support the conclusion that, as matter of law, the JLMC rightly assumed jurisdiction of the scheduling issue. The majority relies on a representation in the union's supplemental appendix that testimony concerning arbitrability was taken by the arbitration panel from various town officials, including the town manager and the fire chief. As the majority concedes, however, the record does not include transcripts of (or any other reliable information concerning) this posited testimony. I do not accept the union's undocumented assertion that such evidence was presented.

The majority also points to the substantial amount of testimony and other evidence concerning the twenty-four hour shift and its observed impact in communities across the United States, which was purportedly contained within the seventeen arbitration award decisions placed before the arbitration

tion, argues that (a) we should "give appropriate deference to the [c]ommittee's interpretation of its own organic statute"; (b) the committee "has consistently, on more than a dozen occasions over a fourteen year period, interpreted Section 4A to permit awards that include 24-hour shift provisions"; (c) three Superior Court judges have upheld the committee's authority in this regard; and (d) "a 'work shift' *merely* defines the number of hours an employee is to work in a given, relatively short (typically 24 hours or less) period of time" (emphasis added). The committee, like the town and the union, gives no attention to any facts specific to the jurisdictional dispute in this particular case.

The judge was of the view that the essential facts were not in dispute. However, facts essential to an appropriate analysis of arbitrability had not been developed. Massachusetts appellate decisions, which clearly require a more fact-based inquiry and analysis in cases such as this, were virtually ignored. Our appellate courts have not considered G. L. c. 150E issues simple. There is no reasoned, analytical application of fact to relevant law with respect to the question of arbitrability to be found in any award of the committee, decision of the LRC, or document in this rec-

panel, as evidence, by the union. I identify four significant deficiencies in this evidence. First, whereas the cited evidence was placed before the panel appointed by the JLMC, the relevant question is what evidence the JLMC itself used to assess the legality of assuming jurisdiction over this matter. Second, case law instructs that questions of arbitrability are to be resolved on a case-by-case basis following a rigorous examination of the facts particular to the situation actually in dispute. Therefore, evidence adduced in wholly separate contexts, like that recited in the seventeen award decisions, is of indeterminate value at best. Third, the purported evidence speaks principally to the merits of the twenty-four hour shift. We are not now concerned with whether the effects of the union's proposed schedule would be good or bad. Rather, our inquiry at this stage must be clearly and exclusively focused on the question whether § 4A excepts the scheduling change from mandatory bargaining. Finally, the decisions and so-called evidence deal with the scheduling issue as a matter only of hours in a day, rather than, forthrightly, as one concerning (1) the arrangement of days, weeks, and months; and (2) elimination of flexibility in scheduling assignments, as well.

I further observe that all other evidence placed before the arbitration panel — including the prevalence of the twenty-four hour shift in neighboring communities and the fact that Bellingham fire fighters working overtime have, in some cases, been on duty for twenty-four consecutive hours without incident — is likewise inapposite for at least one and sometimes all of the four preceding reasons.

ord. Hence, the jurisdiction of the committee, challenged by the town, has not yet been proved or disproved. Whether the committee's jurisdiction extends to the scheduling issue is a question too important to be resolved by default or assumptions, which, as suggested by the lack of an explicit ruling from the committee on the arbitrability question, may have happened in this case.

(d) *Deference to the agency.* The union and the committee argue the rule of deference to an administrative agency (here, the JLMC with regard to its implicit determination that its enabling statute permits the award in this case). They also focus on previous decisions of the committee's arbitration panels in which the so-called twenty-four hour shift[17] has been a component of the total award, and they argue that the awards should be accepted by this court as establishing that the shift issue is a mandatory subject for bargaining under c. 150E.

While the rule of deference to an agency is fundamental, see *Massachusetts Org. of State Engrs. & Scientists* v. *Labor Relations Commn.*, 389 Mass. 920, 924 (1983); *Board of Educ.* v. *School Comm. of Quincy*, 415 Mass. 240, 243-244 (1993), I reject the committee's citation to its own decisions as helpful authority. In all but two of those decisions the jurisdictional issue was never mentioned, let alone analyzed.[18]

Medford Fire Fighters Union, Local 1032, IAFF & City of

---

[17]I again note my view that the proposed scheduling change entails far more than the simple rearrangement of working hours within a single day. The majority appears to find characterization of the proposed schedule change in terms of "hours only" to be both legitimate and credible. I identify this as a significant conceptual difference between my view and that of the majority.

[18]In City of Newton & International Assn. of Firefighters, Local 2759, JLMC No. 91-19F (1993), the panel's decision noted that the city "regards the determination of schedule a 'core management decision,' " *id.* at 31, but aside from noting the city's position, the decision did not discuss precedent of any LRC decision interpreting G. L. c. 150E, or include any explicit statement or ruling on arbitrability. The decision appears to be based, like later decisions, on the observation that some other communities utilize the twenty-four hour shift. I do not recognize the "everybody's doing it" explanation as a lawfully sufficient analysis.

In Town of Winthrop & Winthrop Firefighters Union, Local 1070, IAFF, JLMC No. 92-15F (1993), the award contains no ruling on arbitrability. The town had agreed to implement the twenty-four hour schedule on a trial basis for six months; when the town discontinued the schedule, the matter went to

Medford, JLMC No. 01-03F (2001), is the first case in which an employer's objection to arbitrability is evidenced. The arbitration panel consulted with the JLMC and was instructed to proceed. The city refused to present evidence. The arbitration panel neither analyzed nor reported on the arbitrability issue, but simply recited that fourteen of eighteen comparable communities utilize the twenty-four hour shift, that there was no evidence of any problems, and that there was value in efficiency and lower costs to the employer.[19] The award contains no citation to LRC decisions or argument as to why the shift issue is mandatory for bargaining under G. L. c. 150E.

In the second case, Town of Lakeville & IAFF, Local 3188, JLMC No. 05-04F (2005), the union presented evidence on the twenty-four hour scheduling issue to the arbitration panel. The town refused to arbitrate the issue, asserted that the panel did not have jurisdiction, and argued the panel's lack of jurisdiction in its brief without addressing the merits of the proposal. The arbitration panel followed the JLMC's ruling that the twenty-

---

the JLMC, which awarded the twenty-four hour schedule in a two-to-one vote, with the management member of the arbitration panel dissenting. In Local 1631, IAFF & Town of Norwood, JLMC No. 95-8F (1995), the award ordered a twenty-four hour shift on a trial basis, after a strongly contested discussion, which did not include, however, any attention to arbitrability. In Town of Canton & Canton Firefighters, Local 1589, IAFF, JLMC No. 95-13F (1996), the twenty-four hour shift had been implemented by agreement for three and one-half years; no objection was raised to further negotiation and there was no discussion or attention given to the arbitrability issue.

In both Town of Chatham & Chatham Permanent Firefighters, IAFF Local 2712, JLMC No. 98-2F (1998), and Local 1707, International Assn. of Firefighters & Town of Natick, JLMC No. 96-14 (1998), the twenty-four hour shift was ordered on a trial basis, with either party able to terminate unilaterally the schedule at the conclusion of a one-year trial period. In neither case was the arbitrability of the shift issue raised or discussed, and no reference was made to G. L. c. 150E. In Local 1564, IAFF & Town of Winchester, JLMC No. 96-9F (1997), the shift issue was negotiated without objection by the employer; the arbitration panel's award made only a recommendation that a committee be formed to study twenty-four hour shifts, and the panel's decision made no mention of the arbitrability issue. In Woburn Firefighters, Local 971, IAFF & City of Woburn, JLMC No. 99-7F (2001), the scheduling issue was not arbitrated and there was no discussion or attention to the arbitrability issue; the arbitration panel's decision made only a passing reference to "24 hour schedules" in the context of a discussion of sick leave. *Id.* at 9.

[19]This award was challenged by the city of Medford, and proceeded to Superior Court. However, there was no subsequent appeal.

four hour shift schedule was properly before the panel and did not consider the town's arguments to the contrary, presented in both its brief and at the hearing. As in the present dispute, neither of these cases contains the fact-driven analysis required by Massachusetts case law.

In summary, the committee decisions and awards on the shift issue are not authority, persuasive or otherwise, that the shift issue is within the scope of mandatory bargaining pursuant to G. L. c. 150E. Moreover, I note that none of the committee's opinions or awards provides sufficient analysis or argument on the arbitrability issue. Instead, arbitrability is essentially accepted as a "given," without any explanation, justification, or citation to LRC or other authority.[20] "It is ultimately, of course, the function of the courts to hold agencies only to the exercise of powers expressly or impliedly conferred upon the agencies by statute and to prevent the usurpation of powers not expressly or impliedly granted to the agencies by statute." Cella, Administrative Law and Practice § 93, at 214 n.4 (1986). See *Finkelstein* v. *Board of Registration in Optometry*, 370 Mass. 476, 478 (1976) ("this principle is one of deference, not abdication, and courts will not hesitate to overrule agency interpretations of rules when those interpretations are arbitrary, unreasonable or inconsistent with the plain terms of the rule itself"); *Boston Police Superior Officers Fedn.* v. *Labor Relations Commn.*, 410 Mass. 890, 892 (1991) (no deference when agency commits error of law); *Scaccia* v. *State Ethics Commn.*, 431 Mass. 351, 354 (2000) ("While the commission's considerable expertise regarding the . . . statute is entitled to some deference, interpretation of the statute is ultimately a question of law reserved for our determination").

In addition to framing the scheduling issue merely in terms of hours in a day, the simplistic approaches of the union and the committee treat the effective teaming of fire fighters, assigned together on a particular shift and then also assigned to a particular piece of fire fighting apparatus, as one would treat the

---

[20]The union also relies upon decisions of the Superior Court holding that imposition of the twenty-four hour shift is within the authority of the JLMC. Decisions of the Superior Court, howsoever respected, are not authority in this court.

allocation of fungible commodities. Both parties fail to acknowledge that every trained, professional employee — particularly in the field of municipal safety — possesses idiosyncratic characteristics that directly affect job performance and therefore are highly relevant to the effective teaming of workers. In addition to one's ability to function cooperatively with specific colleagues, the necessary considerations include the extent of each worker's training, experience, health, physical strength, stamina, and emotional stability. The union and the committee appear to view individual fire fighters as interchangeable and their assignment to particular shifts as an arbitrary and indiscriminate process rather than as an essential executive responsibility.

The union and the committee may, upon a complete analysis, prove correct. This is not, however, a foregone conclusion. If work assignments are consolidated and extended from distinct ten- and fourteen-hour shifts into single shifts lasting twenty-four hours and rigidly arranged within an eight-day work week, and if the work month is thereby reduced from sixteen days to eight days, then the ability of the executive to make discerning and informed assignments, with reasonable flexibility, may be substantially impaired.[21] A determination whether the scheduling change interferes with the conscientious assignment of individual workers to shifts and teams and thereby invades management prerogative, for example, requires more analysis then this abbreviated record allows. I respectfully dissent.[22]

[21] I further note that the scheduling change, as proposed by the union and awarded by the arbitration panel, not only requires that shifts last twenty-four hours but also specifies the precise number of days that must intervene between each shift. The first shift in each eight-day period must be followed by exactly two days off, and the second shift must be followed by exactly four days off. These rigid requirements may potentially interfere with a town's efforts to assign shifts responsibly, in as balanced and efficient a manner as possible. Moreover, I find no statutory authority for the imposition of these restrictions by the committee. The argument that a mandate to bargain over "hours" also entails an obligation to bargain over the number of *days* between shifts is highly derivative and, in my view, unpersuasive.

[22] The judge also ruled that the shift issue did not violate the "assignments exemption" in § 4A. The union argues that "the statute itself makes clear that 'assignment' means placement in a station, another geographic location, or even possibly a specific job title."

The Supreme Judicial Court has interpreted the word "assign" in the context

of G. L. c. 161A, § 19, the Massachusetts Bay Transportation Authority statute defining "inherent management right[s]," to include the right "to direct, appoint, employ, assign and promote officers, agents and employees . . . ." The court, emphasizing that the Legislature intended for these words to carry their ordinary, nontechnical meanings in the statute, interpreted the word "assign" considerably more broadly: "to appoint to a post or duty." *Massachusetts Bay Transp. Authy.* v. *Local 589, Amalgamated Transit Union,* 406 Mass. 36, 40 (1989), quoting from Webster's Third New Int'l Dictionary 132 (1961). See *Chief Justice for Admn. & Mgmt. of the Trial Ct.* v. *Office & Professional Employees Intl. Union, Local 6, AFL-CIO,* 441 Mass. 620, 622 (2004). I also find language in *Chief of Police of Dracut* v. *Dracut,* 357 Mass. 492, 502 (1970), to be both important and demonstrative of the need for factual development in this case:

> "The paramount concern of the chief in *assigning* his officers to their respective duties must be the interest and safety of the public, and, to some degree, the safety of the officers themselves, not the personal preference of each officer" (emphasis added).